Pro Se Plaintiff
Elisa Mittelstaed
2224 Us Hwy 87 E, 238
Billings Mt, 59101
(406) 208-1745
Emittelstaed@gmail.com

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

## MONTANA

### BILLINGS DIVISION

| | |
|---|---|
| ELISA MITTELSTAED,<br>An individual and Guardian of Minor Child(ran)<br>MJP, RSP, CMS<br><br>Plaintiff(s)<br>VS,<br><br>STATE OF MONTANA CHILD AND<br>FAMILY SERVICES DIVISION,<br>A Public Entity;<br>STATE OF MONTANA DPHHS,<br>A Public Entity;<br>YELLOWSTONE COUNTY,<br>A Public Entity;<br>RIMROCK FOUNDATION AND ERIN<br>AWES;<br>A Public Entity; and Employee<br>DEBRAN ANDERSON<br>(Official and Individual Capacity)<br>ASHLEE WALKER,<br>(Official and Individual Capacity)<br>BRITTNEY ANDERSON,<br>(Official Capacity)<br>JASON LARSON,<br>(Official and Individual Capacity)<br><br>Defendant(s) | **Case No.1:22-cv-00058-SPW-TJC**<br><br><br><br><br><br>**First Amended Complaint** |

This is a civil action for compensatory and punitive damages, civil penalties, and a demand for jury trial brought by Pro Se Plaintiff Elisa Mittelstaed and her minor children MJP, RSP, CMS; asserting claims for relief under "42 USC § 1983" and

COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES AND DEMAND FOR JURY TRIAL    1

causes of action under the "Montana Tort Claims Act." This claim asserts multiple Tort Actions that continued to occur within the three-year statute of limitations therefor the Plaintiff is informed and believes and herein alleges that the Doctrine of Continuing Tort applies. Also, the Plaintiff has yet to obtain copies of her case record from CFSD or Rimrock Foundation despite there being multiple requests for the release of these records without this pertinent information the Plaintiff cannot properly plead her claims. Her ability to initiate this claim and the allegations herein are based on information obtained from the Child and Family Ombudsman investigation and findings report received September, 2021. The Plaintiff will ask for relief to amend as additional information is obtained.

**Plaintiff(s)**

1.     Plaintiff, Elisa M. Mittelstaed, respectfully represents and alleges as follows: At all times relevant to this Complaint, Plaintiff was a resident of Yellowstone County, Montana. Plaintiff, Elisa M. Mittelstaed ("Elisa Mittelstaed", "Ms. Mittelstaed" "Elisa" or "Plaintiff"), is the mother of minor Plaintiffs MJP, RSP, and CMS, (collectively "The Children") At the time the incidents giving rise to the causes of action within this complaint occurred, MJP was 7 years old, RSP 4 years old, and CMS 3 years old.

**Defendant(s)**

2.     At all times applicable herein, Yellowstone County was and is a public entity ("Yellowstone County") within the State of Montana.

3.     At all times applicable herein, Yellowstone County Department of Public Health and Human Services ("DPHHS") was and is a subdivision or entity of Yellowstone County and The State of Montana.

4.     At all times applicable herein, Yellowstone County Child and Family Services Division ("CFSD" or "CPS") was and is a subdivision, or entity of Department of

Public Health and Human Services Division, Yellowstone County and the State of Montana.

5.  At all times applicable herein, Rimrock Foundation was and is an addiction treatment facility that provides substance abuse treatment within the state of Montana, and County of Yellowstone; and is licensed by The Montana Department of Public Health and Human Services Division.

6.  At all times applicable herein, Erin Awes ("Erin Awes" "Ms. Awes" "Erin") was an individual residing, on information and belief, in Yellowstone County, and an Employee of Rimrock Foundation.  The Plaintiff is unaware if Erin Awes is a licensed addiction counselor, however she performed acts thought by the Plaintiff only to be completed by a licensed addiction counselor.

7.  On information and belief, the Plaintiff alleges that on December 24th 2018 Erin Awes evaluated her for chemical dependency, the results for this evaluation where that Ms. Mittelstaed was not chemically dependent and would not benefit from treatment for drug dependency.

8.  On information and belief, the Plaintiff alleges that on February 28th 2019, 66 days later (over two months) Erin Awes falsified the Plaintiffs medical records and medical history, incorrectly diagnosing her as chemically dependent; causing the Plaintiff to obtain treatment she did not need.

9.  At all times applicable herein, social worker Debran Anderson ("Debran Anderson" "Debran" or "Ms. Anderson") was an individual residing, on information and belief, in The State of Montana, Yellowstone County, and an officer, agent, and/or employee of State of Montana, Yellowstone County and CFSD. Defendant Debran Anderson is sued herein in both her individual and official capacities.

10.  At all times applicable herein, social worker Ashlee Walker ("Ashlee Walker" "Ms. Walker" or "Ashlee") was an individual residing, on information and belief,

in Yellowstone County, and an officer, agent, and/or employee of The State of Montana, Yellowstone County and CFSD. Defendant Ashlee Walker is sued herein in her official and individual capacities.

11. At all times applicable herein, social worker Brittney Anderson ("Brittney Anderson" "Ms. Anderson" or "Brittney") was an individual residing, on information and belief, in The State of Montana, Yellowstone County, and an officer, agent, and/or employee of The State of Montana, Yellowstone County and CFSD.

12. Plaintiff is informed and believes and, on such basis, therefore alleges that Defendant Brittney Anderson was a Department Supervisor, charged with the duty to supervise her subordinates and prevent them from engaging in improper or unlawful conduct including but not limited to violating the Plaintiffs right to privacy, making and failing to report unauthorized disclosures, acts of retaliation, intimidation, harassment and failing to act to prevent injury as alleged herein.

13. Plaintiff is further informed and believes and, on such basis, alleges that Brittney Anderson, instead of properly supervising her social worker subordinate and preventing her from violating Plaintiff's rights as further alleged herein, Brittney Anderson made attempts to cover up, acquiesced, aided, assisted, and abetted Defendant Ashlee Walker in her efforts to violate Plaintiff's Rights.

14. On information and belief, Plaintiff alleges that Brittney Anderson knew, or in the exercise of reasonable diligence should have known, of the wrongful nature of her subordinate's conduct.

15. Plaintiff further alleges on information and belief that Defendant Brittney Anderson knew of or should have known that the wrongful conduct of her subordinate, mentioned herein, and any failure of said duty to act to intervene to correct her subordinates' misconduct, would result in a high probability of further

harm to the Plaintiff, but disregarded said risk by expressly Approving, impliedly approving, or failing to take adequate action to prevent the wrongful conduct.

16.    Plaintiff is informed and believes that Defendant Brittney Anderson's conduct, or acts of omission, were a substantial factor in causing Plaintiff's harm. Defendant Brittney Anderson is sued herein in her official and individual capacities.

17.    At all times applicable herein, Regional Administrator Jason Larson ("Jason Larson" "Mr. Larson" or "Jason") was an individual residing, on information and belief, in Yellowstone County, and an officer, agent, and employee of Yellowstone County and CFSD. At all times relevant herein, Defendant Jason Larson was Regional Administrator for CFSD and Yellowstone County, charged with the duty of supervisory and policy making authority.

18.    The Plaintiff is informed and therefore alleges that Defendant Jason Larson was notified and made aware of multiple Unauthorized Disclosures of the Plaintiffs confidential case record information that included health information protected by HIPPA and state law, confidential case record information, employment information, and federally protected drug treatment information. Which was used to inflict ongoing acts of retaliation, harassment, threats, intimidation, and assaults to the plaintiff, in furtherance of a conspiracy to cause unjustifiable outrageous and egregious harm to the Plaintiff to punish her.

19.    The Plaintiff is further informed and Believes and on such a basis alleges that Jason Larson knew or should have known based on the information he received that such egregious and unlawful acts mentioned herein, created a substantial risk of harm to the Plaintiff and required him to act to look into and take necessary steps to intervene and stop the unlawful behavior and prevent further ongoing injury to the Plaintiff, but Jason Larson disregarded such risk by expressly approving, impliedly approving, or failing to take adequate action to prevent the wrongful conduct.

20.    Plaintiff is informed and believes and therefore alleges that Defendant Jason Larson's conduct or acts of omission, were a substantial factor in causing the Plaintiff's harm.

21.    The Plaintiff is informed and believes and, on such basis, alleges that defendants Debran Anderson, Ashlee Walker, Brittney Anderson, and Jason Larson where acting under color of state law, and within the course and scope of their duties as employees or agents of the County of Yellowstone Child and Family Services Division in committing the acts herein alleged.

## JURISDICTION/ VENUE

22.    The events that form the basis of this complaint occurred in Yellowstone County, Montana. This Court has jurisdiction over the parties, and the matters alleged herein, and the Billings District Court in Yellowstone County is the proper place of venue for this case to proceed. This court has concurrent jurisdiction over The State law Tort claims and Federal Civil Rights Claims.

## BACKGROUND

23.    On November 5th of 2019 Plaintiff Elisa Mittelstaed her Fiancé Michael Sheets and their three children MJP (8), RSP (5) and CMS (3) where met by a very broken system, when Defendant DCFS case worker Debran Anderson knocked at their door. The Plaintiff agreed to speak with Ms. Anderson allowing her access to the home and answering any questions she had. Most of which pertained to concerns of possible verbal altercations between Ms. Mittelstaed and Mr. Sheets. The Plaintiff agreed that she and Mr. Sheets were not on the best of terms, but that was not known to their children. While there where disagreements to be had, they were rarely had due to their children always being around. And they surely never where verbal outbursts or yelling.

24.    It was explained that, the family had just recently experienced tragedy, when Mr. Sheets was pronounced dead after a head on collision. By the grace of God, he survived. However, it was discovered that he was having "silent seizures," a condition thought to be associated with his service in the army and his deployments in Iraq. Since July of 2018, (five months prior) He had a total of four accidents, three of them occurring before the most recent severe accident. The cause of the accidents was not known until after the last, when it was determined he was having the small "silent" seizures and they had been unaware they were happening. This brought with it a lot of unplanned and unpleasant obstacles. The Plaintiff stated to Ms. Anderson that "Respectfully, these were personal and private matters;' and were not "something that she felt comfortable discussing further with a complete stranger." "These issues where not uncommon occurrences within households," and "they in no way constitute or contributed to her children being abused," or "neglected" or "put them at risk of such."

25.    Ms. Anderson Provided no explanation as to the basis of the report made. She spoke only about a report made in 2017. It was proven that The Plaintiff's ex-husband, and biological father to MJP and RSP, had made a malicious and fraudulent report to the department. This report was investigated and determined to be unfounded no case was opened, as it was found to be a fraudulent report and a retaliatory act. The Plaintiff felt, just as it was in 2017, this may be another report also done in retaliation by the same individuals. Debran Anderson had to fulfil her obligation to investigate, and after that it would be done. The plaintiff was completely unaware of what she soon would be forced to contend with, or how every aspect of her life would be held hostage from her, including her children if she didn't do so.

26.     The Plaintiff explained to Debran Anderson that the report in 2017 was irrelevant as it was unfounded and it should not be used to imply or support the validity of the allegations within this report, which she would not inform her of. She questioned Ms. Anderson stating that "if there are clear concerns that give rise to the allegations of this report, then she needs to be informed of what the concerns are so she can address or correct them." As Debran had already stated "that Ms. Mitteistead's home was clean, her children even considering them being sick, appeared to be otherwise healthy, and happy with their needs met. With that being said Ms. Mittelstaed suggested that "it would be reasonable and respectful to conclude that this was not a situation for which intervention by the department was necessary." There was nothing indicating that the circumstances where dire or that she and Mr. Sheets were incapable or unwilling to act on their own behalf had a situation presented itself.

27.     When Elisa's responses did not support and in fact thoroughly invalidated Debran's claims. Ms. Anderson's Demeanor changed, becoming antagonistic and confrontational. This Hostility only worsened upon Elisa's questioning of Debran's reasoning and authority. Debran while exercising her duties as a social worker for CFSD, was accustomed to having interactions with families, who were not competent enough to question her actions, allowing her to exert her will upon them.

28.     Debran Anderson knowing she had no reasoning to suggest otherwise, agreed with the Plaintiff, but required her to submit to a drug test which Debran stated was a requirement that was enforceable by law, and was not optional. Further alleging that the case couldn't be closed as unfounded without this requirement being met. The Plaintiff was unaware of the laws and trusted that Ms. Anderson was being truthful.

29. At this time Ms. Anderson had no court order or judicial authority allowing her to force the plaintiff without consent into drug testing. The Plaintiff agreed to take the test under the direction of Ms. Anderson that it was a requirement. However, her children were sick, and they had a scheduled appointment. So, she agreed to go "as soon as her children being sick" would allow her to do so.

30. Debran Anderson left the Children in their home and under the care and custody of their mother Elisa Mittelstaed, indicating she felt they were safe and not at risk to remain in the home. The Children remained in the home from the 5th until the 7th without Mrs. Anderson petitioning for Emergency removal. And she didn't seek an emergency order because Ms. Anderson knew that MJP, RSP, and CMS where not abused or neglected or at risk and could remain safely in the home.

31. The Plaintiff tested first thing the following Morning. She was not informed of the results of the test. She did not hear back from Debran Anderson Until November 7th, when she alleged that the drug test results where positive for methamphetamine. The Plaintiff immediately questioned the accuracy of the test, stating that she did not use Methamphetamine, nor did Plaintiff have a history of drug use. Understandably concerned, upset, and wanting to correct the inaccurate results, she asked to be re-tested and inquired about false positive tests and whether there had been documented reports of false positive results with this form of testing? And if so, what could be the cause? Could it be foods? Or possibly a medication she was taking? The Plaintiff informed Debran Anderson that she took vitamins that were unregulated and Adderall Daily.

32. Debran Anderson had a duty to investigate the Plaintiffs claims and the accuracy of the testing, but she instead disregarded Ms. Mitteistead's claims that she had not used Methamphetamine. She made no efforts to look into the results during this point of her investigation, or at any other times for which investigating

these claims was her responsibility, in order to confirm that the test was in fact accurate, despite the Plaintiff consistently denying using methamphetamine throughout the entirety of the case. Furthermore; Ashlee Walker upon being assigned the case in January of 2019, had a responsibility to also investigate this claim as it was continuously expressed by the plaintiff. Ashlee Walker also failed to address the plaintiff's concerns. Then Ms. Anderson and Ms. Walker having been given this information failed to document it within the Plaintiffs case file or include it in any court affidavits sworn to as facts by either defendant.

33.    Ms. Anderson immediately instructed the Plaintiff to pack up the essential items for each of her children. And bring them and their belongings to the department. It was determined that she could no longer have contact with her children, and they could not remain in the home for their safety. The Plaintiff refused to bring her children as it was not necessary, and when asked Debran Anderson would not give a reason for it being necessary. She hadn't provided any information or offered any explanation as to what was currently taking place and what could be expected to take place, or what it was that caused the children harm or put them at risk.

34.    Debran knew that it was unlawful for her to seize the Plaintiffs children without a court order unless she was doing so due to clearly observable circumstances which created such a great risk that injury to the children could not be avoided without immediate removal. She had an obligation to act to avoid removal whenever the circumstances would allow the children to remain in the home safely. Which action would still require Ms. Anderson to submit documentation to the courts within two days, and provide notice to Ms. Mittelstaed also within 2 days. Neither of these requirements where met after forcing the

Plaintiff to release her children to her or be arrested. Which Violated the Plaintiffs fourth and fourteenth amendment rights.

35.     She was taking children (one with a disability that made him more susceptible to trauma) away from their mother and home without reason, justification, and without consent. Traumatizing them, causing emotional and mental distress to three happy, healthy, emotionally and mentally nurtured children. Alleging that it was the only way to prevent imminent risk or harm. When she knew or could have known upon the exercise of due diligence and conducting a reasonable investigation that no such risk was evident, and the removal was the only action that would threaten the wellbeing of or create a risk of injury to the children. This knowing would cause a reasonable person, especially; one who's duty it is to protect said children from injury, to make reasonable efforts to avoid removal when the circumstances allowed for the children's wellbeing to be maintained upon remaining in the home.

36.     Any reasonable person in Debran's position could determine within their investigating of the family, that the children were very well provided and cared for, and none of the issues or negative circumstances facing the family where impacting the children as Mr. Sheets and Ms. Mittelstaed in being loving, protecting parents to their children, would never allow their problems to impact their children. With no other indicators of abuse or neglect, it would be determined that with or without services the children remaining in the home was appropriate and the least disruptive means of achieving the departments goal.

37.     If the law required that a case had to be opened for the purpose of addressing the results that was fine, and was understandable. As the test results where a real issue needing addressed. There was no need to get her children involved and subject them to the trauma of removal from their home and mother, as she was of no risk to her children. There was nothing indicating she was not able to care for them, or that

she had not been caring for them. These are some of the points but not all, for which Mr. Duke once assigned counsel to Ms. Mittelstaed should have addressed and presented to the courts, while acting on his duties in her defense, yet failed to do so. Resulting in her receiving ineffective assistance of counsel. Mr. Sheets who also resided in the home, had no allegations towards him, he too was drug tested and the results were not questioned. Yet he also was told he could not have the children in his care but was provided no reasoning as to why.

38.     The Plaintiff continued to try to reason with Ms. Anderson but refused to do as she Instructed, and hand over her children, Ms. Anderson; instead of adhering to the law and obtaining judicial authority,  in an attempt to get the Plaintiff to comply with her demand, threatened the plaintiff, coercing her while under duress, by stating she was to "have her children at the department within the hour" or Ms. Anderson "accompanied with a police officer" would "come to her home to take custody of the children and she would be arrested."

39.     At no time throughout the entirety of the case was any information or facts provided stating "how", or "when", "in what way", and by "what means" the plaintiff physically neglected her children. The Plaintiff was asked if she had a preference on temporary placement for her children, and that if she didn't then Debran Anderson would decide on a suitable placement. The Plaintiff informed Debran that her children where not to be placed anywhere without her approval. Ms. Mittelstaed called her mother (Diane White) and explained to her what had happened. Out of fear that the police would come to the Plaintiff's home and she potentially being arrested in front of her children, she met her mother at the department with her 3 children.

40.     At the Department it was explained that until an investigation into the positive test result was completed, Ms. Mittelstaed could not have contact with her children.

Again, no explanations where given that would warrant the Plaintiffs children needing to be removed. What should have taken place was a family functioning assessment required by CFSD policy 202-3 which is held after the initial investigation and Required Safety Assessment procedures are completed per CFSD Policies 201-2 and 202-3. However, the department did not conduct either failing to complete both requirements.

41.     The Plaintiff was Given a sheet of paper titled "Safety Plan" this document was blank other than one section that stated, "reason for Plan" and "mother was under the influence of drugs while caring for her children." She refused to sign the document as this statement was false. Debran said that it "really didn't matter, as this was just to allow Diane White (plaintiffs Mother) to care for her children, while the department completed its investigation into the test results and report." The Plaintiff did not sign a "Voluntary Protection Plan" at any time during the case. Ms. Anderson claimed this should take no more than a week or two. And that there was no alternative, and the Plaintiff did not have a choice to refuse to release her children. If she didn't sign the safety plan allowing her mother to be placement, in doing so she would be leaving it up to Ms. Anderson to decide placement. Either way, the children would not be returning home. The Plaintiff's children where forced crying and screaming to leave with their grandmother in the parking lot of the Department of Family Services. This was severely traumatizing for them all.

42.     These acts clearly contradict Debran Anderson's claims of Ms. Mittelstaed agreeing to a "Voluntary Protection Plan" which she states under penalty of perjury in her sworn affidavit Requesting "emergency services" and fraudulently claiming the children were removed upon "emergency circumstances for their safety," and due to the severe nature of the abuse "no services could be offered, that would allow them to remain in the home" on December 10th 2018, at 8:00 A.M. When in fact

they were removed without notice or parental consent, and in the absence of exigent circumstances, on the afternoon of November 7th 2018.

43.     This affidavit was signed and dated on the 10th of December, 2018, However, it was not filed with the court until 8 days later on December 18th 2018, this exceeded the two-day requirement for submission of the petition to the clerk of court and providing of notice to the Plaintiff, causing the filing of the petition to exceed the five days from removal requirement, and further resulting in the Plaintiff not receiving notice or a hearing within the statutory timeframe. However, this would only apply given Debran Anderson acted in accordance with and adhering to the provisions of statutes she has a lawful duty to adhere to (Which she did not). This would have required that Debran, on November 7th, 2018 (the correct date for which she had a legal obligation to do so), thoroughly investigate the circumstances, and upon a finding of "clearly observable", "articulable evidence" that would give rise enough to lead a reasonable person to suspect impending injury was immediately foreseeable. Requesting Judicial authority for emergency removal, emergency services and temporary investigative authority, and furthermore providing notice and submitting of a petition within "two days". Which would have afforded the Plaintiff her right to due process of law when acting to deprive her of the care, custody and control of her children, a fundamental liberty interest.

44.     Debran Anderson failed to fulfil her legal obligations substantially. And she did so knowing that her acts where unlawful and that committing such acts would result in deprivation of the Plaintiffs rights. Debran Anderson knew or should have known that such depravations of the Plaintiffs rights created a high probability of injury to the Plaintiff. Debran with deliberate and reckless indifference to the risk of the Plaintiff proceeded to act in such a way which directly caused injury to Ms. Mittelstaed.

45.   The plaintiff was manipulated threatened and coerced into believing she had no choice but to bring her children to the department. Debran Anderson knew she did not have judicial authorization to allow her to take MJP, RSP, and CMS from the care custody and control of Elisa Mittelstaed without notice or parental consent, and in the absence of exigent circumstances. Ms. Anderson also had no reason to believe she possessed the authority to have the plaintiff arrested upon her kidnapping her children. Said seizure was unlawful and in violation of the Plaintiff's Due Process rights, familial association rights, right to be free from unlawful seizure, and familial privacy rights provided her under the fourth and fourteenth amendment of the US and State of Montana Constitutions.

46.   The plaintiff alleges, she had frequently interacted with the department and its case workers including Debran Anderson for several years through her employment at New Day Inc. She respected the department for what she believed was true of their work. She has always believed, that you should have to apply to have a child. Pass a test, ensure that you're not only financially stable, but mentally stable. And because children are natural products of their environment, that you can provide an environment that's conducive for producing an undamaged child. That not everyone is fit or prepared to be a parent. And such a Privileged responsibility should be treated with great care.

47.   The Plaintiff spent six years as a Lead Youth Care Specialist and Program Manager at New Day which is a therapeutic group home for adolescents with cognitive and behavioral health issues. Most of who were in foster care, some for the majority of their lives. They had suffered significant and sometimes unfathomable abuse. During her time at New Day, she gained an immense amount of knowledge, training and skills. She was able to apply these skills when parenting her own children. The Plaintiff has seen first-hand the reality of child abuse. She

knows what child abuse and neglect looks like. And is aware of the monsters some people can be, and what they are capable of doing to children, even their own. It's that knowing that confirms just how important and very needed our child welfare system is. And anyone tasked with such an essential duty deserves the upmost respect.

48.    However; what the Plaintiff experienced, was not that. This wasn't one of those situations, and they weren't those people. What the Plaintiff experienced was motivated by something different, with very ill intentions, and it maliciously departed from everything she understood and believed about child protective services. The Plaintiff considers herself and Mr., Sheets to be good people, as do their friends and family. The Plaintiff has no criminal history, Mr. Sheets; also has no criminal history. And is a disabled veteran who served multiple tours overseas in Iraq and worked sales at Bloedorn lumber for 16 years. The plaintiff ran a daycare out of their home after resigning from New Day to spend more time with her children, both she and Mr. Sheets are educated, both grew up in small towns and had healthy positive upbringings. They are well known and respected in the community in which they were raised and the community for which they currently reside.

49.    MJP the oldest child is autistic and requires additional therapies and interventions to ensure he has the skills, and the environment, to make the most out of his life with a disability, Which the Plaintiff is very much involved in every aspect of. Not only is she his biggest advocate, she is the driving force behind everything that's essential to his betterment. The department had access to all of this information through the children's pediatricians and therapists, yet they took none of this pertinent information into account when deciding whether removal and continued removal was necessary.

50.     The Plaintiff Alleges that the following statements are proven facts that will be proven and supported by multiple witnesses. And that these facts completely contradict, and do not support, or align with the statements of "facts" sworn under penalty of perjury, by Debran Anderson in her Affidavit submitted to the courts. The Entire Affidavit of Debran Anderson was fraudulent.

51.     The Plaintiff spoke to her children multiple times daily and went through their routines with them via video chat daily. her first visit with her children was scheduled for November 9th, 2018 at the department. Diane White (plaintiffs Mother) before the visit on November 9th, asked if they could skip the visit as she was worried that the children seeing their mother in person, only to be forced away from her when the visit was over, would cause more harm than good. Expressing that it was very difficult for her to get them calmed down after they would all become extremely upset. She suggested that they continue to do as they had been and just get through the next week.

52.     It was decided it was best to cancel the visit. Ms. Anderson would later document this in her affidavit as "mother did not show up for this visit," choosing to omit the reasoning as to why the visit did not take place. This provided the courts with information that could easily be misled causing a potentially inaccurate understanding that would impact judicial determinations. And misrepresented the plaintiff to look bad. Debran knew that in exercising her duties as a social worker she had an obligation to act with honesty and offer complete, factual information to the courts. Debran knew or should have known that omitting exculpatory and false information in her petition would mislead the courts creating a substantial risk of deprivation of the Plaintiffs rights and liberty interests. Debran while aware of the risk acted with deliberate indifference to said risk which caused injury to the plaintiff. Ms. Mittelstaed, was unaware throughout the entirety of the case what was

documented within Ms. Andersons Affidavit, and was unaware of what allegations were being made. This information and any documents containing said information was intentionally concealed and kept from the Plaintiff, the department knew that if Ms. Mittelstaed was aware of the fabrications and false allegations being promulgated she could easily act to discredit them and prove them untrue which would prevent them from adjudicating her children.

53.     On November 11th, 2018 Plaintiff spoke to Ms. Anderson inquiring about what to expect and if the investigation was progressing. Debran confirmed that it was still ongoing, and that she needed to be patient as she had more cases to address then just hers. She would reach out to let her know when she had more information and what the plan would be moving forward.

54.     November 13th, 2018 Ms. Anderson stated to Diane White that the Plaintiff was not cooperating with the department and she could not reach her. Diane White contacted her daughter and asked why she was not cooperating. The plaintiff became upset and explained to her mother that "despite her urge to want to reach out to Debran more, she was trying her best to not call more than once a day and unfortunately she had not been able to reach Ms. Anderson since they last spoke on the 11th. Which is when she gave the Plaintiff the impression that she was bothered by the plaintiff contacting her too frequently."

55.     The Plaintiff and Mrs. White concerned with the allegations made by Debran Anderson that she was not cooperating, decided to reach out via a group call. Ms. Anderson could not be reached.

56.     On November 14th due to continued inability to reach Ms. Anderson Bruce White (Plaintiffs Father) went to the department in an attempt to speak to her. Mr. White was able to speak with here and addressed the claims she made that Ms. Mittelstaed was not cooperating. Mr. white explained that due to the misinformation

and lack of communication happening, there was uncertainty and distrust around her ability and willingness to make decisions and appropriate judgments in regard to their family, and most importantly the children, who were having an extremely difficult time being separated from their mom and dad. They also were struggling to make sense of the allegations and the removal and she was not helping them to understand what was happening or giving them any information to provide clarity. He did not agree with the test results and didn't believe the Plaintiff was using methamphetamine, none of what was taking place made sense, their lives where very much in a state of upheaval that was unnecessary and functioning under so much distress was unbearable.

57.     Mr. White asked for a copy of the Department's policies, or something that explained the processes of investigations Ms. Anderson appeared to be in a hurry and mentioned this to him while making it seem as if she were leaving the office, so before leaving Mr. White asked that she please get in touch with the Plaintiff and or Mr. Sheets as they would be leaving to Sheridan Wyoming for Mr. Sheets to have a brain scan at the VA Hospital there within the upcoming days. All of this information is falsely documented within the sworn under penalty of perjury affidavit of "facts" of Debran Anderson. Ms. Anderson did not contact the Plaintiff until after she and Michael Sheets had already left town, at this time she informed the Plaintiff she would need to get a "sweat patch" test and that Friedel would provide the test instructing her to go in as soon as possible.

58.     On November 18th Plaintiff returned from Wyoming and left several voicemails with Debran Anderson, there are records of these calls as well as text messages confirming these attempts to contact Ms. Anderson.

59.     On November 19th Plaintiff had an oral procedure to repair Receding gum lines from periodontal disease. This same day Mrs. White was contacted by Ms.

Anderson who again relayed misinformation to her, that the plaintiff was again not being compliant, this time with the sweat patch testing.

60.    Mrs. White reminded Debran that the Plaintiff and Mr. Sheets had only just recently returned home, and of the Plaintiffs dental procedure. Explaining that they had a lot on their plates and assured her they were doing their very best to fulfill all their obligations especially those pertaining to the departments requirements as their children being able to be back in their home and this being resolved was all they wanted.

61.    Diane White also informed Ms. Anderson that the Plaintiff had admitted to her that she had been purchasing the Adderall she had been taking illegally without a prescription for quite some time. And that she was ashamed and embarrassed, and she realizes she made a huge mistake and she stopped taking it.

62.    After speaking with Ms. Anderson Mrs. White contacted the plaintiff via text to clarify the patch confusion. Upset with Ms. Anderson again relaying misinformation to her mother, she sent her a text message and "reiterated what she had already informed her of and asked "that she please be better about communicating clearly when relaying information to her Parents, ensuring that the information is correct and is understood correctly."

63.    The following day, the Plaintiff along with Mr. Sheets went to Friedel to get the sweat patch. Michael Sheets will attest to being a witness to these events. While there Friedel informed the Plaintiff that she was "required to submit to another dragger test before they could put the patch on." The procedure for a dragger consists of taking a large firm, abrasive swab and rubbing it all over your gums until an area on the swab changes color indicating that the needed amount of saliva has been collected for testing. This can sometimes take upwards of 2 minutes of constant scrubbing of the gums.

64.    The Plaintiff explained that she "was unaware that submitting to another dragger was required before getting the patch. And that she had recently underwent an oral procedure to repair severe gum recession." "the procedure was extensive and covered a large portion of the Plaintiff's gums." She showed them her mouth and even removed the guard that acted as a retainer type barrier protecting the exposed area on the roof of the plaintiff's mouth where the skin had been removed before it was attached onto the receding areas of gums.

65.    She expressed concern and fear that "the swab would not only damage the grafts by tearing them off, but that it would be extremely painful," and politely asked for an alternate form of testing to be done. Friedel refused to do any other form of testing, stating the "swab testing was a requirement." This was a difficult position to be In and the Plaintiff was unsure of what to do with their unwillingness to make accommodations for her and being fearful of getting the dragger.

66.    Mr. Sheets suggested that he and the Plaintiff step outside to call Ms. Anderson, the Plaintiff attempted to explain to Ms. Anderson the situation and before she could finish, Debran Anderson interrupted with an aggressive tone saying the Plaintiff "needed to comply with the requirements of the department and that included any and all testing." Ending with her threatening that her "choosing not to, meant choosing not to have her children returned to her home" and she hung up.

67.    Mr. Sheets encouraged the Plaintiff to attempt to do the test and she proceeded with the dragger it was extremely painful caused a lot of bleeding resulting in the Plaintiff going in to have her dentist examine her mouth. Ms. Anderson would later fabricate and omit the facts of what took place on this day within her affidavit as a deliberate attempt to misinform the courts. Including a false claim that the Plaintiff

admitted to Friedel she used Methamphetamine which is completely false and Michael sheets who was present at the time will testify to that claim being false.

68.     After having the patch put on, the plaintiff noticed that it had a light stinging sensation, however; Friedel scrubbed the area where they would be placing the patch very aggressively. It was believed that this stinging was due to the essential "rug burn" the scrubbing created.

69.     November 22nd, 2018, the plaintiff spent Thanksgiving with her children and family at her parents Mr. and Mrs. Whites home, this was the first time she had been allowed to see her children since they were removed from her care on November 7th. Ms. Mittelstaed was only allowed two hours to be with her children and it had been 15 days since she had seen them in person aside from video chats. Feeling as if this was not enough Mrs. White contacted Ms. Anderson to ask if the plaintiff could stay with Mrs. White and she could supervise the contact until the investigation was completed. Debran Anderson would not allow this, stating "the patch was only recently put on, and the departments policy would not allow that during this time."

70.     CFSD Policy 402-5: (refer to exhibit [1]) does not support Debran Anderson's reasoning for not allowing Diane White (Plaintiffs mother) to supervise her visitation with her children. Policy 402-5: also requires Ms. Anderson to develop a visitation plan within seven days of the start of services, Debran failed to complete this requirement and no such plan was ever implemented and reviewed with the Plaintiff every thirty days, there is no documentation of information pertaining to visitations, the multiple denials of visitation, denials of supervision requests or explanations of decisions regarding visitation.

71.     The Plaintiff was gone at 5pm as instructed and Thanksgiving ended with her children screaming, crying and begging for her not to leave them. This caused

increasingly more psychological, emotional, and physical harm to the Plaintiff and her children. The Plaintiff was experiencing worsening feelings and symptoms of severe depression and PTSD.

72.     On November 26th the Plaintiff spoke to Ms. Anderson about her decision not to allow Diane white to supervise her contact allowing her to stay with her children. Plaintiff was upset that this was taking so long and that she was still being referred to as if she in fact abused and neglected her children and was in fact a drug user or addict when these allegations were untrue. Ms. Anderson still had not provided a justifiable reason as to why the Plaintiff could not be with her children, or how she allegedly abused or neglected her kids or what if anything was it that caused there to be a belief formed that they were at risk of being abused.

73.     There was not meth in her system she admitted to taking amphetamines, but she stopped taking those weeks prior and even when she was, she had been prescribed them for years and never did they cause her to neglect or abuse her children. The Plaintiffs children where well taken care of they were nurtured, loved, cared for, happy and thriving, before the department took them from their home, and caused unnecessary trauma and upheaval. The Department was accusing the Plaintiff of the egregious act of child abuse and neglect forcing her to close her child care business and be without her children while also alleging she was drug dependent but would not provide any documentation or information despite the consistent requests from the plaintiff for this information to support the serious allegations.

74.     Debran Anderson agreed that if the investigation was still ongoing at the time of her daughter RSP's upcoming 5th birthday, she would allow a longer visit at Mrs. Whites home with her children to celebrate.

75.    Plaintiff contacted Ms. Anderson to ask her about the Plaintiffs patch as it was extremely itchy while at the same time burning whenever touched. Which was odd as she had not experienced these symptoms in the earlier time of wearing the patch, Debran Anderson did not respond. (All communications between herself and Debran Anderson where kept in the form of screen shots and call recordings obtained via an automatic call recording application).

76.    A couple days after speaking to Debran the Plaintiff reached out to Ms. Anderson again in regard to the patch which now was extremely agitated, and Ms. Mittelstaed had difficulty moving as any type of motion was extremely painful. Ms. Anderson responded condescendingly stating that "if the patch comes off all visits will stop", that "this was often a common excuse used by drug users to enable them to use." Acting with extreme indifference to the possible risk of Ms. Mitteistead's health.

77.    The Plaintiff felt insulted and was shocked by this response, completely disregarding and denying her injury. Threatening to take away her visit as a way to keep her from seeking medical attention that she needed.

78.    The Plaintiff the following week reached out to Debran informing her of her worsening condition and provided substantial proof, she was suffering a significant medical reaction to the required drug patch, Debran Anderson knew or should have known upon being informed on multiple occasions that the plaintiff was injured and had been developing worsening concerning symptoms that without medical attention would likely worsen, putting the Plaintiffs health and well-being at significant risk. Debran while acting out her duties on behalf of the County and its CFSD who provided Debran Anderson authority to permit or prohibit Ms. Mittelstaed contact with MJP, RSP, and CMS used that authority and the plaintiffs medical need to inflict suffering onto the Plaintiff.

79.    That night in order to get any sort of relief Plaintiff slept on her bathroom floor with a soaked towel draped over the patch on her side as the burning was so severe.

80.    The following morning the Plaintiff was unable to do anything and was now vomiting and had swelling of her side and developed a fever, the edges of the patch where lifting slightly from the skin and the area was oozing indicating there may be an infection. Mr. Sheets was adamant that it was infected and he wanted to take Elisa in. however, not wanting to have her visit denied she refused. After failing to encourage Elisa to go in Mr. Sheets reached out to Debran and left her a message.

81.    The Plaintiff continued to text Debran throughout the days leading up to the day she decided to go in, she informed Debran multiple times via text that she was extremely ill, eventually letting her know that Mr. Sheets was going to take her in, so she could get something to help before the party. She didn't want her being ill to affect her daughter's special day. Further explaining that she would not allow them to remove the patch and would only ask that they provide her with something to help relieve some of the pain and maybe an oral antibiotic, if it was determined one was needed.

82.    Debran responded, instructing her, to keep in mind if she goes in and the patch is removed she "will not be going to the party." The Plaintiff changed her mind and decided to have Mr. Sheets get a different type of topical cream to use to possibly get enough relief. Michael Sheets disagreed and was able to encourage the plaintiff to go in. Due to her worsening condition the plaintiff agreed. She reluctantly reached out to Debran Anderson however she didn't answer. A text was sent by Mr. Sheets informing her that they were on their way to have the patch checked. At the hospital the doctor said removing the patch was the only option and leaving it on was not advised.

83.    Debran knew that Elisa's loyalty and love for her children especially RSP on her birthday was predominant over everything else, and because Debran had allowed Elisa very little in person contact with her children Elisa would do anything to see her children especially on RSP's birthday. And that not being allowed to attend her daughter's birthday would cause severe emotional suffering to the Plaintiff. Debran used this along with the authority afforded her by the County to act on her duties to the Plaintiff as leverage to exert influence on Elisa's decisions causing her injury, and she would continue to inflict this suffering onto the Plaintiff for the entire time she was assigned social worker to the case.

84.    The Plaintiff was able to reach Ms. Anderson who now gave her an ultimatum, that she would allow her to have her visit and celebrate her Daughters birthday on the condition that she get a dragger test at Friedel before they closed at 5 PM At this time, it was 4:45 PM and she was still at the doctors

85.    Debran was aware that Friedel closed at five o'clock and that this was an unreasonable demand as it would be impossible for her to make it. Ms. Mittelstaed crying on speaker phone tried to explain and reason with Ms. Anderson who had no sympathy and snidely suggested that the Plaintiff "hurry and call" and "hope they will wait" for her. The doctor over hearing this conversation assured the Plaintiff that she would be taking photos and writing a detailed statement that she could provide to Ms. Anderson explaining the need for the removal.

86.    The removing of the patch was excruciating. The Doctor took pictures as she stated she would. Friedel never answered when Plaintiff called, and she was unable to get there before they closed. Debran Anderson would not allow the visit and after reiterating to the Plaintiff that she was not to attend the birthday party she contacted Diane White and informed her of this as well.

87. This was devastating for Elisa and her children especially RSP, whom upon finding out her mother would not be coming became extremely upset. Ms. Mittelstaed due to the constant torment and holding over of her visitations, depriving her of contact with her children, and the overwhelming feelings of failing her children, and thinking her children felt as if their mother had abandoned them and her not having the ability to comfort them and protect them was suffering with debilitating anxiety, depression and overwhelming sadness.

88. On December 6th, 2018 Plaintiff contacted Debran Anderson to inform her that she would be busy attending several interviews within the next few days and she was still very ill from the patch injury and worried that this could have a negative impact on her having a successful interview and obtaining a job. She asked Ms. Anderson if her children would be allowed to come home that she would continue to do whatever they asked. It was known that They were suffering greatly especially the Plaintiffs oldest son who is autistic.

89. Debran Anderson explained that she was waiting on another individual "Roxanne Waller" who needed to be a part of the decision making to return to the office as she was unavailable at the time. This individual had to be included in deciding what type of testing she would be doing. Debran Anderson wasn't sure when Roxanne Waller would be available to do that, but that she wouldn't expect it to be long, she would be in touch with the Plaintiff as soon as Ms. Anderson, and Ms. Waller and their team spoke.

90. On or around December 11th, 2018 Debran Anderson contacted Plaintiff informing her that it was decided she would be required to submit to daily urinalysis at Community Solutions as well as complete the CD Evaluation to prove she in fact was not drug dependent. Ms. Anderson explained that she would begin this testing

the following day and would need to call in every morning. She said nothing to the Plaintiff as to her petitioning the courts for emergency removal on the 10th.

91.     On or around December 22nd the Plaintiff was served with an order for emergency protection from the courthouse stating that the department had removed her children from their home on December 10th at 8:00 am. However, as previously explained above, the Plaintiff's children had been removed from their home illegally on November 7th, 2018. And not the 10th which this document stated while being filed with the court on the 18th and served upon the plaintiff on or about the 22nd of December.

92.     This paperwork did not contain the affidavit of Debran Anderson which the Plaintiff knew nothing about and had no knowledge of what the document alleged until 2020 when she finally was able to obtain a copy.

93.     The petition fails to set out any specific facts to support the allegations against Elisa Mittelstaed of Physical neglect. The "facts" set out in the petition are false, despite having been verified by Debran Anderson under penalty of perjury; and she knew at the time she verified the petition the statements contained therein were false, either directly or indirectly or by omission of critical known exculpatory facts.

94.     The Plaintiff at no time was ever provided information explaining the detailed allegations proving physical neglect of MJP, RSP, and CMS, neither verbally or via physical documents. This information was not provided during any of the hearings pertaining to the allegations or by the department following her multiple requests, for the entirety of the case despite consistently requesting this pertinent information.

95.     As of December 22nd, of 2018 Plaintiff had received two documents, the order for emergency removal and the safety plan containing one line of information from November 7th, 2018.

96. On December 21st four days before Christmas Debran Anderson made it a requirement that before the Plaintiff would be allowed to spend Christmas with her children and family, that before Christmas the Chemical Dependency Evaluation had to be completed. At this time there continued to be no court order in place allowing for enforcement of a treatment plan, the Plaintiff was complying simply on threats of Debran's fraudulent authority.

97. The Plaintiff was not using drugs, and she was complying with the "required" daily urinalysis and these tests where all negative and there had not been a positive test since the initial testing, she was still not allowed to have contact with her children. She was able to get an appointment for the evaluation on December 24th, 2018 (Christmas Eve) It was 3 hours long and she was drug tested before it began and the results of this test are negative.

98. The Plaintiff signed an authorization for disclosure which listed only Debran Anderson along with the specific information that could be released. The results of this Evaluation are that she is not chemically dependent nor is there reason to believe she is at risk to become chemically dependent. No treatments or interventions where deemed necessary.

99. The Plaintiff explained to Ms. Anderson after making the appointment that it was for Christmas Eve and while she tried, she was unable to get anything sooner, and that she desperately wanted to spend Christmas with her family. Ms. Mittelstaed stressed that she had never been away during a holiday. Debran assured her that if the evaluation was completed on Christmas Eve morning, she would make certain that she was available. She was instructed to call Ms. Anderson before leaving and she would confirm it was done, then she would allow the visit at Diane Whites home to be with her children and celebrate the Holidays.

100.  The Plaintiff was worried because she felt Debran didn't like her and she felt she was not in fact trying to help her but seemed to be acting against her. Debran Anderson had consistently acted in ways that caused the Plaintiff and her children to suffer immensely. Debran Anderson did this just a couple weeks prior when she wouldn't allow the visit for her daughter to celebrate her birthday or seek medical treatment.

101.  The Plaintiff pleaded with her to promise that she would answer. She was begging that Ms. Anderson do as she says she will, and Debran Anderson assured her that she would. These claims would be proven deceitful, when she text Debran Anderson the day before the appointment reminding her that the evaluation was the following day and received no response.

102.  On the day of the appointment which was Christmas Eve the plaintiff text Debran Anderson again and let her know she was on her way there and again received no response. When the evaluation was completed, she called Debran Anderson as she instructed the Plaintiff too, and again she did not answer. She waited and called back 5 times before the evaluator said she could not wait any longer as she had to get home to her family to celebrate the Holiday. She gave the Plaintiff her cell number and said it was ok to have Ms. Anderson call her when she returned the Plaintiffs call. Debran Anderson never Returned the call. Diane white was too scared due to the threats of taking the kids from her home if she violated any rules, and would not allow her daughter to come to the house without having the ok from Debran Anderson.

103.  Again, The Plaintiff didn't show up when her children expected her. And she was forced to spend Christmas through new year's alone in her home. the emotional pain this caused was substantial. As a result of Debran's continued torture and inflictions of emotional anguish on Ms. Mittelstaed she was left fighting severe

depression which resulted in her experiencing suicidal ideation. She began seeing a therapist 2 to 3 times a week in order to cope.

104. On January 3rd, 2019 the first hearing the "Show Cause" was held, Plaintiff met her court appointed attorney David Duke on this day during the few short minutes before court. It was Plaintiffs understanding that the state was to show cause for the emergency removal, and explain the claims of abuse, or risks of abuse, that lead them to conclude, that it was not only serious enough to be an emergency, and remove MJP, RSP, and CMS without their mothers' consent, and without a court order. But that the risk was so significant that no resources could have been offered that would allow the children to remain safely in their home.

105. However, none of this took place, nothing was discussed on the matter of show cause. There was no discussion of the allegations or the circumstances surrounding them, no preponderance of evidence provided, and no opportunity for the Plaintiff to provide a defense, or to even speak. The Plaintiffs ex-husband Jason Puzio was not present but his appointed counsel was, however, he was unaware he had appointed counsel as he had not yet been served on the matter. This attorney was present at the January 3rd hearing and stipulated to the show cause and to the emergency removal and need for MJP, RSP, and CMS to be in protective placement.

106. He had not even met JP and he hadn't even been presented with any paperwork informing him of the case. Yet he stipulated to facts pertaining to the case. This took place, and David Duke said nothing in regard to this matter. David Duke did not address the court to inform them that the Plaintiff contested the show cause until nearly the end of the hearing. When he did address the court to inform them of the Contesting, that is all he would inform them of. Failing to inform the Judge of the pertinent details that would allow him to get an accurate understanding of the case and allegations.

107. The judge acting on the information he was given and the belief that the information provided was factual ordered that the state was warranted on removal of MJP, RSP, and CMS. And they would remain out of the home, unfortunately this determination was based on false allegations promulgated by CFSD and provided to the court but not disclosed to the Plaintiff. After court the Plaintiff's family understandably upset, confronted Mr. Duke who said that he had done what he was instructed to do and he contested the cause which is why there would be a contested show cause hearing. Further stating that the Plaintiff would have the opportunity to explain her side then and the state would have to prove theirs at this time.

108. If David Duke had educated himself on the facts of the case as the Plaintiff would expect that he had done, Mr. Duke would have acted on that knowledge and honored his duties to effectively represent the Plaintiff and her rights, and in doing so MJP, RSP, CMS would have come home that day. And they should have. Mr. Duke had access to all pertinent information about the case and this information proved the need for out of home placement as unnecessary. He should have known that this was an unjustifiable claim, that could easily have been disproven that day and at any hearing thereafter. Mr. Duke should have educated himself on the facts of the case and acted on this knowing and addressed the courts in defense of the Plaintiff, preventing the ongoing acts of judicial deception, and he did not.

109. A complaint was made with the Office of the State Public Defender which alleged that the State Office failed to provide Ms. Mittelstaed with adequate or effective representation. And this resulted in the Plaintiff receiving ineffective assistance of counsel. There was never any follow up made in regards to this complaint.

110. For over two weeks the Plaintiff could not reach Debran Anderson nor could her Family. This was not uncommon; however, it had never been this long. Jason Larson was contacted with no response as well as Mr. Duke who responded days later. On or around January 22nd David Duke contacted Ms. Mittelstaed and informed her that Debran Anderson was no longer with the department and that she had been assigned a new worker, he provided the contact information for Ashlee Walker. The Plaintiff reached out to Ashlee Walker and they spoke briefly. This was their first time speaking and they had never met in person.

111. The Plaintiff expressed to Mrs. Walker her frustrations with the complete disregarding of her claims that the test for methamphetamine was inaccurate. that she had only been taking Adderall which she was prescribed and had taken daily for years, before making the poor choice of purchasing it without a prescription when she was no longer being prescribed it. The Plaintiff was honest and never denied that she had made a mistake. And While she agreed that it was a bad decision and she was wrong for doing so, she did not agree with the removal of her children from her home and the alleged abuse or there being a risk of such abuse. And after 3 months why would no one provide her with what the basis was for deeming that such life altering changes and upheaval for her children and family was necessary for their safety.

112. The Plaintiff claimed that "she knew better than anyone as the mother of MJP, RSP, and CMS that they suffered no neglect or abuse and where never unsafe." She further explained that her attorney did not do an adequate job representing or speaking in her defense at the recent hearing. She said all of these things with honesty and in confidence with the hope that Ashlee Walker would understand and actually help her. Ashlee Walker informed the plaintiff that she hadn't had a chance

to look over her file but assured her that she would do so as soon as possible and try to get the Plaintiff the answers she needed.

113. CFSD Policy requires upon Debran Andersons removal from the case that both she and Ashlee Walker are to go over the case and the case specifics to ensure the new worker has a full understanding of the pertinent details of the case. Ashlee Walker should have fulfilled this requirement of speaking with Debran Anderson on the case details and contacted Ms. Mittelstaed while knowing said information. The plaintiff waiting two weeks without having any contact with anyone about her case, and having to reach out to the new worker on her own accord is against policy.

114. On January 24th just, a few days after speaking to Mrs. Walker the Plaintiff was contacted via Facebook messenger by multiple people in regard to a Facebook post about Ms. Mittelstaed and her children. They claimed the post was made by [AK]. Who is the Plaintiff's half-sister's cousin on her father's side. The Plaintiff is of no relation to [AK], nor does she associate with her. The Plaintiff had to block [AK] from all social media platforms due to a situation roughly two years prior that the Plaintiff is not completely certain as to the reason of.

115. Ms. Keifer seemed to have formed a very strong vendetta or anger towards the Plaintiff and was intent on causing chaos for her and Ms. Mittelstaed wasn't even aware of her anger towards her, or that she was vengeful. The Plaintiff believed that [AK] was responsible for the vandalizing of her property and defaming of her daycare. The Plaintiff eventually learned of Mrs.Keifer motives and blocked her from having any access to her, and for over a year she hadn't heard from or even seen [AK] Until this happened.

116. It's important to know that the Plaintiff and the Plaintiff's family kept the entire case with cps private as such serious allegations could hurt their reputations, their business all while being untrue. The Plaintiff ensured that no one knew other

than the people who were bound by confidentiality; Diane White, Bruce White, Michael sheets, JP and DR and the Department. From November 5th, 2018 until January 24th of 2019 there was no problems and the case remained to be kept private.

117. A screen shot of the post was sent to the Plaintiff as she had Ms. Keifer blocked and could not see her profile nor could she see the Plaintiff's. The post stated that "anyone who's child attended the Plaintiffs (the post gave the Plaintiffs first and last name) daycare should know that she had abused her children, and they were placed in foster care with the Plaintiff not allowed to have contact with them." it further stated that "there is a good chance that Plaintiff had abused other children in her care as well." That the Plaintiff is "mentally unstable" a "tweeker" and "pill head" and not the person she claims to be."

118. Ms. Mittelstaed unblocked [AK] so she could send her a message on Facebook to confront her. [AK] didn't respond. The Plaintiff then received notification that [AK] had taken the opportunity while being unblocked to continue to make further comments this time on several of her public timeline photos of the Plaintiff and of her children. These comments stated "it's all for show." "the Plaintiff" was "pretending to be a good person" "and mother with a normal life" and "making it seem as if she still had her children" "when they had in fact been removed" and she "probably wouldn't have them back again." Calling the plaintiff disgusting" "Alleging Plaintiff was stealing MJP's Adderall and then purchasing it illegally when that wasn't enough" these comments where public and could be seen and shared by anyone.

119. The Plaintiff quickly began deleting all the comments. That is when Mrs.Keifer sent a private message asking, "why she deleted the comments?" calling the Plaintiff all sorts of vulgarities, claiming she knew more about the Plaintiff's case then she did. That the Plaintiff "would not be getting her children back" if [AK]

"has anything to do with it." Eventually because the Plaintiff continued to deny [AK]'s knowledge and invalidated her claims, Ms. Keifer in an attempt to prove her claims valid admitted she had "a good friend at the department" and "that's where she is getting her facts."

120. The Plaintiff immediately called Ashlee Walker, not because she believed or thought that it was Ashlee Walker, that hadn't even crossed her mind. She believed it was someone at the department. But had not thought it to be Ashlee Walker.

Mrs. Walker immediately said she did not know [AK]. Saying, "her name didn't sound familiar." Ashlee Walker told the Plaintiff that [AK] was "probably just trying to upset her." And she "shouldn't worry about it," Ashlee Walker stated she 'really didn't think anyone their would-be telling her anything."

121. The Plaintiff disagreed, alleging that "[AK] couldn't have known the things she knew, had she not been told." Ashlee Walker told the Plaintiff she would pay attention to see if anyone at the department says anything about it. And the call ended.

122. The Plaintiff thought that this person [AK] was speaking about would be on her Facebook friends list with their job listed as a social worker. She was shocked to discover "Ashlee Walker Rangistch" employed at DCFS. "Rangistch" is also the Plaintiffs half-sister's last name. Ashlee Walker had just told her that she didn't know [AK] when they were not only friends but in fact are related.

123. The Plaintiff called Ashlee Walker's supervisor Brittney Anderson explaining everything and emailing her all the messages. Brittney Anderson told the Plaintiff she was going to look into it and call her back. When Brittney Anderson called back, she stated that Ashlee Walker admitted to knowing and to speaking with [AK]. That [AK] was in fact a relative of Ashlee Walker and had reached out to her seeking info, and that Ashlee Walker showed Brittney Anderson some of their message

exchanges. Brittney Anderson said, while it is not acceptable for her to be speaking to her, she read through some of the messages and found that no health information appeared to had been shared so there was no violation of HIPPA.

124. The Plaintiff told Brittney Anderson that she did not trust Mrs. Walker as she already lied to the Plaintiff in saying she didn't know [AK], and they now had gone as far as to deleting each other as friends on Facebook to hide their association further. "Why do that?" and "why lie?" if you have done nothing wrong? The Plaintiff expressed that [AK] had information she couldn't get otherwise. Regardless of whether or not it included the Plaintiffs health information, Ms. Keifer having any of the Plaintiffs information private or otherwise is harmful to her and to her family.

125. The Plaintiff further explained how [AK] is vindictive and has ulterior motives towards her that are beyond malicious. That she gets satisfaction from causing her harm and would be willing to ruin the Plaintiffs life and she asked Brittney Anderson for a new case worker.

126. Brittney Anderson refused, saying that "the department already didn't have enough workers," and "the ones they had where already taking on three times the caseloads." "It's just not going to happen." Brittney Anderson claimed she couldn't prove that Ashlee Walker did anything wrong, and unless the Plaintiff could get her proof that HIPPA was violated then there is nothing she could do.

127. The Plaintiff explained that she had given her sufficient proof. Plus, the fact that Ashlee Walker is related to the Plaintiffs sister as well as [AK] the person who is harassing her and has made clear that she has malicious intentions towards the Plaintiff. Ms. Mittelstaed believed that would constitute a conflict of interest. Brittney Anderson didn't agree.

128.  Brittney Anderson had a duty to supervise her subordinate Ashlee Walker and act upon her discovering that Ashlee Walker had breached the Plaintiff's confidentiality and had made multiple unauthorized and malicious disclosures that had caused injury to the Plaintiff, that without her acting to correct, would continue to cause severe injury to the Plaintiff, while having a duty act Brittney Anderson with deliberate indifference failed to act to prevent further injury. Brittney Anderson in fact attempted to cover up the acts of Ashlee Walker therefore being an active conspirator in the conspiracy between Ashlee Walker and Ms. Keifer.

129.  The Plaintiff reached out to David Duke for help. His response was that he is sorry, but he isn't being paid to handle that matter only matters within the scope of the Plaintiffs cps case. Mr. Duke wasn't handling the cps case either. The Plaintiff then reached out to Jason Larson, and the guardian ad litem whom all gave no response to her requests and concerns. This was absolutely devastating for the Plaintiff who was already suffering substantially from these circumstances.

130.  Ms. Mittelstaed was reaching out for help and her pleas where being ignored, she was at the mercy of individuals who were holding her children hostage, who had all the power needed to cause injury to her and her family and it was obvious that those involved were not looking out for the family's best interest. To make matters worse the Plaintiff didn't know who, or where to go for help or if she did if anyone was going to help. The harassment to the Plaintiff continued while increasingly getting worse.

131.  A few weeks later while at a supervised visit at the department, JP was supposed to attend however he didn't show up. After leaving the Plaintiff had only driven a couple blocks from the department, when she got a text from a number she didn't recognize, asking "how her visit was?" she text back "???" and they replied "your kids are good kids". "It breaks my heart that they got stuck with a piece of

shit for a mom," and a "dad who doesn't want them," "who couldn't even show up for them."

132. The Plaintiff called the number, and it was ignored right away, which sent the call to voicemail which was [AK]'s. She clearly didn't think that through. Not only was [AK] told about the Plaintiffs visit, but she was given Ms. Mitteistead's phone number. The Plaintiff continued to reach out to Jason Larson and continued to mention the harassment within her emails to Mr. Duke even though he had informed her that he was not able to help with the matter.

133. Due to the Plaintiff not being allowed to provide daycare services. She applied for and was hired for a job in the Emergency Department of Billings Clinic, she had to inform Ashlee Walker, and shortly after doing so, an anonymous individual only known to be female started calling the hospital making complaints about the Plaintiff working there, later these complaints became the caller simply ranting about the Plaintiffs private life and making untrue claims to whomever answered the call. Stating the Plaintiff was a "child abuser" and "drug addict in treatment" "had mental health issues" and she would "steal drugs," the "hospital was headed for a lawsuit."

134. Ms. Mittelstaed was devasted by this and extremely humiliated, she felt the staff no longer had respect for her. As they were left to speculate whether or not the allegations made by the caller that she was a child abuser where in fact true or not. It was an extremely humiliating experience for the Plaintiff and caused her to suffer debilitating anxiety, not knowing when another call might be made and what would be said. It was too much to tolerate and she had no choice but to resign.

135. Ms. Mittelstaed relinquished a two-year contract secured by a $1,500-dollar contractual bonus that she had to repay. And was without income to pay her bills while Mr. Sheets was suffering from medical issues for which continued expenses

where increasing. This financial strain was a source of contention within their relationship that eventually would result in Mr. Sheets moving out of the home. [AK] later openly admitted to the Plaintiff and to many others who will be called on as witnesses that Ashlee Walker was the one who was telling her everything, she wasn't concerned about consequences as it was clear there was none.

136. Ashlee Walker made multiple unauthorized and malicious disclosures of the Plaintiffs private information one of those disclosures was made to MJP's teacher at Poly Drive Elementary School. He had been struggling at school with his teacher before the department got involved and due to the restricted contact, the Plaintiff was not able to finish addressing the issues, she had been in the midst of addressing before her rights to her children were removed. This was a rather serious matter that started when MJP who is a very happy and kind child that enjoyed school up until the start of the current school year. His demeanor changed, he was acting out and not wanting to go to school. the teachers had informed the Plaintiff, that MJP had been hiding under his desk and refusing to come out. This was very unlike him and after multiple failed attempts to get answers from the school and the teacher, the Plaintiff decided to put a recording device on her son. What was discovered was absolutely heart breaking and shocking, it was confirmed that MJP was being subjected to verbally abusive behavior from the Teacher.

137. The Teacher could be heard taunting and making fun of MJP in front of the other students. And at one point they seem to be going out for recess and MJP seemed to be struggling to put on his snow gear, and zip his coat as he needed assistance with this. It seemed as though he was taking too long, as the teacher could be heard saying "well we might get a couple minutes of recess if MJP can stop being baby and get his coat zipped." you can hear the other students become frustrated after her claiming MJP would cause them to miss recess, and they are heard making

comments and expressing their annoyance with MJP. The teacher then further antagonizes the situation saying "she isn't going to do it for him it's ridiculous that he is too lazy to learn how to zip up his coat" "that he's just gotten used to being coddled" and "he could do it if he tried" and "what is he going to do when he is on. His own." "he thinks he deserves special treatment and he just expects that he is entitled to have everyone do the things he just doesn't want to do for him."

138. The other students can be heard getting even more upset and making comments seemingly to be all standing around him waiting and watching him probably feeling ashamed and attacked struggling and the teacher refusing to help him. This would explain why MJP would go and hide under the table. He was escaping the bullying. The teacher then says, "if anyone wants to help him feel free but I'm not going to," "and I won't make anyone help him, it's up to you," "I'm prepared to sit here for the entire recess until he does it himself," "he needs to grow up" at this point another student is believed to have helped him zip his coat. This was just some of the verbal abuse heard on the recording in one day. He was also forced to eat lunch in his snow gear and he was extremely hot. They did this to avoid him taking off his snow gear and having to help him put it back on.

139. The Plaintiff and Mr. Sheets where deciding on who they should bring the recording in to be reviewed by they wanted to ensure the right individuals had it first. The department became involved creating a barrier that restricted their ability to further address the issues and when the Plaintiff did attempt to address the issues, she was severely undermined by the school staff and they attempted to avoid the serious matter altogether. This situation worsened several months later when Ashlee Walker made multiple unauthorized disclosures to the teacher in question further escalating the situation.

140.  Ashlee Walker was informed by the Plaintiff herself of the situation and that this Teacher was upset with the Plaintiff. And due to the circumstances and the questionable acts of the teacher still not yet resolved, that the teacher need not be involved in the case nor be questioned or given any details. As her involvement would be detrimental to MJP and the family and addressing the serious allegations of verbal abuse to MJP by this Teacher

141.  This disclosure was after the school had already been interviewed which took place early on in the case in 2018 and there was no reason for Ashlee Walker to contact this teacher and give her excessive information. After Ashlee Walker gave MJP's teacher this private information, the teacher used it as an attempt to deflect the attention from her actions towards MJP and avoid accountability. While instead using the case and the allegations to attack the credibility of the Plaintiff which she did, and this will be proven as it is documented in text message exchanges between the Plaintiff and the teacher.

142.  Ashlee Walker disclosed this info for no reason other than to inflict emotional turmoil and unjust humility on the Plaintiff.  As a result of Ashlee walkers' disclosure, the Plaintiff was slandered by the teacher.

143.  During court on January 3rd as mentioned above, David Duke informed the courts that the Plaintiff contested the show cause and while the courts failed to allow the Plaintiff due process that day, they were aware of the contesting and the department was also well aware of this as well. Following the January 3rd hearing, Plaintiff made several attempts to reach out to Mr. Duke to go over the case and ensure he was aware of all the pertinent details, and the Plaintiffs intentions moving forward, to prevent any further errors being made, and ensure Mr. Duke was in a place to effectively defend her.

144. Ms. Mittelstaed emailed Mr. Duke several times as she had questions pertaining to the expectations for the contested show cause hearing. She wanted to provide Mr. Duke with the statements she had from the children's doctors, therapists and others, to support that the removal of the children was not necessary. Mr. Duke never responded. There was no open communication, the Plaintiff was never informed of important details and never provided paperwork. Rarely was their communication when needed and often the Plaintiffs questions would remain unanswered. When they did communicate it was what had to be communicated and nothing more, very minimal time and effort was spent fulfilling the obligations or duties of those involved.

145. This left the Plaintiff while emotionally under distress to be uniformed without the knowledge to defend herself and with inadequate representation. David Duke emailed the Plaintiff the afternoon before the hearing, on February 28th, 2019 to inform her that the hearing was the next day, and made her aware of the time, as again she was not served the notice for the hearing, Mr. Duke was. This wouldn't have been an issue, had Mr. Duke respectively notified the Plaintiff sooner than the day before court, or had Mr. Duke responded to the Plaintiffs emails reaching out to him in an attempt to prepare.

146. David Duke did not take this opportunity the day before court to advise the Plaintiff or provide responses to her requests within the weeks prior. Mr. duke simply told the Plaintiff the time of the hearing. The plaintiff replied confirming the time and inquired about the expectations for court, and her plan to address the court, to speak on her own behalf, and provide the statements of her witnesses. And this was disregarded.

147. Ms. Mittelstaed arrived early for the hearing accompanied by Diane and Bruce White, and Michael Sheets. (Who will all be called on as witnesses to these

claims) The Plaintiff had multiple sworn statements from witnesses from people who had frequent and consistent interactions, both personal, and professional, with her and MJP, RSP, and CMS. These interactions spanned years, these people could provide an honest, accurate, and impartial reference to the Plaintiffs character, and the environment her children lived in, and whether or not the children suffered abuse, or where at risk thereof. And whether they believed the Plaintiff had provided MJP, RSP, and CMS with all of their needs, or whether or not she appeared to be mentally unstable or drug addicted.

148.   While in the hallway waiting for the hearing to start David Duke, followed by Brittney Anderson, Ashlee Walker, the guardian ad litem, the States Attorney scot Pederson and the attorney for JP walked by the Plaintiff and her family. David Duke did not stop and speak to the Plaintiff but continued to walk around the corner with the others. The Plaintiff looked around the corner when Mr. Duke did not return, he wasn't there. After some time had passed, Mr. Duke showed up approached the Plaintiff stating that it was time to enter the court room.

149.   While walking into the court room, the Plaintiff attempted to quickly inform Mr. Duke about what she had for proof but wasn't able to say much of anything before the hearing began. The attorney for the state addressed the court, and immediately said that he had spoken to Mr. Duke during the "pretrial conference," (which Plaintiff was unaware of, and was not a party to, nor was the Plaintiff informed of when Mr. Duke walked past her waiting in the hallway of the courthouse)

150.   The states Attorney informed the court that the "cause was no longer contested," and "all parties stipulated to the show cause and the adjudication of the Plaintiffs children as youths in need of care." The Plaintiff was very confused by this as it did not seem accurate. She attempted to speak to Mr. Duke, and Mr. Duke

quietly shushed the Plaintiff. Mr. Duke then also stood to acknowledge the court confirming the states declaration, only if the matters of the disposition were pushed out. If this was done, he was on board with the adjudication taking place that day.

151.    The judge asked if the plaintiff agreed and she asked Mr. duke what was happening and what she should say and he encouraged and advised her to agree. The attorney for JP then said, he also would like the adjudication done that day and also stipulated. Ending with the guardian ad litem agreeing with the state's requests. With that the judge again acting on the information he was given confirmed the children were still with their grandmother, followed by the matter of the visitation schedule, concluding with him allowing the Plaintiff unlimited contact with her children as long as an adult was there to supervise. (which Ashlee walker would not honor and made the Plaintiff come to the department for the visits to be supervised. stating "the judge can give the Plaintiff the unlimited contact, however; it's up to her to honor it") And the hearing ended.

152.    The state didn't prove their case. The Plaintiff didn't have the opportunity to hear or defend the allegations. The Plaintiff did not request that Mr. Duke have the disposition be set out as he requested. David Duke should have discussed these matters with the Plaintiff prior to the hearing instead he ignored the Plaintiffs attempts to prepare in the days prior.   Mr. Duke was aware the Plaintiff had requested a contested show cause and did not agree with the removal of her children.

153.    The Plaintiff unfamiliar with the courts terminology and processes did as Mr. Duke instructed. Ms. Mittelstaed who despite being unsure of what she was agreeing to, was trusting fully that David Duke who had a fiduciary duty to act in her best interest would not advise her to attest to something that was against her interest.

154. The cause was stipulated to without the Plaintiff being previously advised. Nothing was again asked of or explained to the plaintiff, the Department still had not stated the allegations of the case and what the plaintiff did to abuse or neglect her children or what was to be done to get them back.

155. The Plaintiff had completed everything that was listed on the treatment plan ordered by the courts months prior to the court ordering the treatment plan. And not even the treatment plan which is required to list the specific allegations and actions needed to correct said allegations, contained this information, it was incomplete. The area where these facts should have been listed along with necessary tasks to complete was left blank. The treatment plan was essentially a blank document. There was no current goal or set of requirements that the plaintiff was instructed to complete to allow her children to return to their home.

156. The Plaintiff's family was being put through complete upheaval and traumatized and had been provided no reason for it being done and given no directive as to what they needed to do or correct to have their children returned to their home. All that was known was that there was in fact disputed allegations of drug abuse and child neglect. In the beginning of the case, The Plaintiff made it very clear to Debran Anderson about JP the children's biological father and it was determined that it would be against the best interest of the children to involve JP.

157. However, Ashlee Walker later would show up unannounced to Diane Whites house saying that they were not allowed to inform her before, as a precaution to keep her from possibly hiding the kids. Ashlee Walker told Mrs. White to pack up MJP, and RSP's things as they were going to JP's home. Ashlee Walker was informed in January when assigned to the case about the history between the plaintiff, MJP, and RSP, JP and JP's live-in girlfriend DR.

158.  That history consisted of severe domestic abuse of the Plaintiff until their separation when MJP was two and RSP was four months old. DR, JP's girlfriend has an extensive history with cps including the termination of her parental rights to two of her children. JP also had his parental rights terminated to two of his children, that's four children between them.

159.  DR was only recently released from pre-release and JP had served 10 years in prison for robbery, and threats of killing the mother of the two children of which his rights where terminated. The mother of these children had her and her children's names changed due to fears of JP finding them. JP has a record of domestic assault and multiple PFMA charges from abuse to the Plaintiff.

160.  At the time RSP was placed with JP he was serving 10 years' probation and was on interstate compact out of Wyoming for the conviction of aggravated assault with extreme indifference to the human life, for almost killing a woman in Wyoming in 2008. JP registers as a violent offender on top of being a 3-time felon. While JP lived in Billings, he was an absentee parent for almost three years, and the Plaintiff and Michael Sheets were working on terminating his parental rights. The last time he had contact with his children for years.

161.  His having no contact came shortly after he and the Plaintiff separated. The Plaintiff filed child support against him, he became upset as he didn't want the financial burden. He attempted to gain custody of the children believing this would prevent him from having to pay child support, the Plaintiff attempted to reason with him and hired a mediator to help. The mediator suggested Ms. Mittelstaed allow JP to take the children for short visits which usually only lasted for a couple hours during the week, and where never overnight or for multiple nights in a row.

162.  Eventually JP asked for an overnight. The Plaintiff agreed as it was promised that there would be multiple family members staying with them and present during

the time the children where there. The Plaintiff could not reach anyone the entire weekend. On Monday morning JP was to have them back to their home at 9:30 am but didn't show up.

163.  JP later called the Plaintiff and stated his girlfriend DR would be bringing the children she was running late. DR arrived at 12:30 and the children looked ill. They were pale with red swollen eyes, dehydrated and lethargic.

164.  RSP's hair was ratted and matted to her head. she smelled of urine and had dried poop on her clothing. RSP's pants where soaked due to her diaper, which was saturated, five times its size and not even able to attach to itself, RSP's legging pants where what was keeping it on. The Plaintiff removed her diaper, and she had severe diaper rash. The skin was bleeding and raised, most of the area was completely raw. This developed in the short time of a weekend.

165.  The plaintiff immediately got them ready to go to the doctor. While washing RSP's hands and face with a washcloth. She noticed that her fingernails where chipped and bleeding. the tips were red with abrasions. It was later discovered that DR was intravenously using heroin while she was 7 months pregnant. MJP said that while DR was in the bathroom for long periods of time, she would lock RSP and the other smaller child in a bedroom. leaving MJP who was a bit older in the living room alone.

166.  MJP said RSP would cry and cry and knock on the door to get out, that they did not eat breakfast or lunch or get drinks. The Plaintiff had a background check completed on DR and that's when she learned about her history. The plaintiff also went to their home after this incident and saw personally the slider lock on the outside of the door and markings on the inside lower area of the door, as well as the absolute filth of the home. There were multiple shoestrings stained with blood

scattered around the floor along with piles of clothing dirty dishes, diapers and garbage.

167.  The Plaintiff filed a report with CFSD and DR had her children removed from the home after this incident. The Plaintiff was instructed by CFSD that as long as JP allowed DR to remain in the home she was not to allow her children to be there. JP chose not to have a relationship with his children to be with DR while she continued to use drugs while pregnant. The Plaintiff had not heard from JP since then other than him asking the Plaintiff to purchase he and DR a car seat so they could bring their baby home from the hospital and them making a false cps report against the plaintiff that was unfounded in 2017 in retaliation for the Plaintiff reporting them.

168.  This is the same unsubstantiated report Debran Anderson references to as if it where factual in her affidavit stating it as negative "history" in order to deceive the courts into believing the circumstances where dire and deem the emergency removal as justifiable.

169.  The Plaintiffs children didn't seem to mind that their dad no longer wanted to be involved in their lives as they had grown up believing Michael Sheets was their dad, as he raised them from the time MJP was two and RSP was four months old they called Michael Sheets dad and JP by his first name.

170.  Ashlee Walker took the Plaintiffs children who were being protected from her because of an unproven allegation of meth use. And determined that JP would be a safer environment and didn't put them at imminent risk. Ashlee Walker made this placement change maliciously to hurt the Plaintiff. As Ashlee Walker doing so came shortly after a threat from [AK] as to JP getting the children. It is unreasonable to believe that this was done with the safety of the plaintiff's children remaining

paramount. The risks where known and where spoken of on multiple occasions and disregarded.

171. Ashlee Walker listened to Diane White pleading with her not to place the Children with JP, that he didn't care for them and they were still dealing with trauma from the abuse they suffered years earlier while he was entrusted with their care. The Plaintiff's children were crying and refusing to go. scared and traumatized. Ashlee Walker did not care. When Ashlee Walker realized she was not going to be able to force MJP, who was big enough to put up a good fight. Ashlee Walker decided to let MJP stay with his grandma but forced RSP who had been locked in a bedroom and neglected to go with JP.

172. RSP for the second time was forced away from one environment and into another and was taken from her grandmother's home screaming and crying and handed over to JP and DR, who had a history of neglecting her. The first week RSP was with JP, RSP reported to her mother that her foot was broken. Diane White sent the Plaintiff photos of the entire top of RSP's foot being purple and yellow and green. RSP said that the other child in the home who was bigger than her dropped a weight on her foot.

173. RSP told Ashlee Walker that the other children in the home poop and pee in the closet and pinch and bite RSP. And that RSP was being left alone with DR while there was a safety plan that specifically said that was not to ever happen. RSP Also showed the bite marks and pinch marks on her body to Ashlee Walker RSP was in fact the one who verbally stated to Ashlee Walker all of these claims, followed by Michael Sheets, Diane white and Ms. Mittelstaed who expressed concerns that the children were not being properly supervised in the home. And that the lack of supervision was allowing RSP to be injured and she would continue to be in

significant risk of continued injury unless someone intervened to correct the situation.

174. Despite the expressed concerns and the extensive concerning history of JP and DR and Ashlee Walker's awareness of the need to intervene there was no action taken to address the concerns. Diane White was asked to bring over clothing for RSP on a Friday. When Diane White arrived at their home, she found that RSP again was alone with [DR] violating the safety plan.

175. Diane White reminded DR of the plan. DR started yelling at Mrs. White and then JP pulled up, JP also began to verbally assault Diane White in front of the children. JP who is 6'3" and 350 pounds was acting and displaying anger and aggression towards Diane White. Eventually he proceeded towards Mrs. Whites car where MJP who is autistic was sitting. He tried to forcibly remove MJP from the car. MJP who is scared of JP resisted JP's continued force causing MJP's arm to be broken. Diane White was able to leave and call the police who came and reported the incident.

176. The Police unable to reach anyone at the department had to allow RSP to remain in the home with JP, as the department had the responsibility of making decisions for the children but where unavailable. The Plaintiff upon hearing what had occurred called the departments emergency number and could not reach anyone. Ashlee Walker did not contact the Plaintiff until after the weekend had passed on Monday afternoon.

177. Ashlee Walker stated that she gave JP a warning that "if one more thing happens," "if RSP tells her anything else or anyone is injured again;" that Ashlee Walker "would remove RSP from his home." There were further complaints to Ashlee Walker about the issues being ongoing and Ashlee Walker ignored these reports, leaving RSP in that situation without help.

178.  In March of 2019 David Duke contacted the Plaintiff suggesting that they reach out to the department and discuss closing the case, giving the department the chance to get on board. If they chose not to, they would still move forward and petition the court for a status hearing asking for dismissal on the condition that the Plaintiff agree to a parenting plan with JP. Ms. Mittelstaed disagreed, JP didn't care about her children, and they didn't like JP. She stated that "having RSP with him at the time and the trauma that resulted from it was bad enough."

179.  "She wanted this to be done." "her family needed to have their lives back." "To encourage her to agree to a parenting plan that would allow her children to go to a dangerous environment every weekend," "was the most absurd thing she had ever heard," "right along with her abusing or neglecting her children."

180.  The Plaintiff later discovered she would have no choice in the matter, as the courts made the parenting plan a requirement. She completed the plan in a desperate attempt to get her children back home. Mr. Duke petitioned the court for a status hearing to ask for dismissal as soon as the Plaintiff had the parenting plan filed.

181.  On Christmas Eve December 24th, 2018 two months before Ashlee Walker was assigned this case as mentioned above, the plaintiff completed a chemical dependency evaluation. The evaluation determined that she was not drug dependent. However, she could benefit from attending a group for codependency in regards to her relationships. The Plaintiff followed up on those recommendations and she and her therapist began discussing this topic during the plaintiff's time with her.

182.  On March 28th David Duke had petitioned the courts for a status hearing to ask that the case be dismissed. The Plaintiff had already completed all requirements of the treatment plan and there was no risk to the children. Further the claims of this being necessary to ensure the children's safety where never proven in court or

provided to the plaintiff. Due to that on top of the harassment, intimidation and threats, the validity of everything was proving even more irrelevant now than ever.

183. Based on the actions of the department in giving no clear explanation of the neglect, and the fact that there was nothing stating what was to be corrected or what goal was to be met in order to have the children returned home. Nothing taking place indicated that the departments intent was assisting the family in correcting an already existing situation of abuse and neglect, but rather that they were attempting to create a situation of abuse and neglect where one did not exist.

184. Ashley Walker in furthering these attempts to keep this case open called Rimrock Treatment and spoke to Erin Awes who performed the plaintiff's evaluation. She asked that Ms. Awes release the evaluation results to Ashlee Walker. The Plaintiff had not authorized Rimrock to disclose this info to Ashlee Walker and the release only listed Debran Anderson as being authorized to receive specific information. Which Debran Anderson had done two months prior when it was appropriate to do so and there were no issues.

185. Ashlee Walker proceeded to provide information to Erin Awes knowing that this information was false with the specific intent to deceive her into altering the Plaintiffs medical evaluation falsifying the results. These false claims where that the Plaintiff purposefully removed the drug patch, refusing to comply with the department. Which can be proven false. It will be shown that Ashlee Walker in fact, had access to documented medical records and notes and pictures from the providing doctor stating it was removed due to an allergic reaction. That it was the doctor who had removed the patch at the clinic, not the Plaintiff. And the removal of the patch in no way supports the Plaintiff being drug dependent.

186. Ashlee walker not only had access to these documents, she had knowledge of the facts and was aware of these facts, and had no reason to not believe them to be

true when she chose to fraudulently misrepresent them to Erin Awes. The Plaintiff never refused to comply with drug testing and has copies of all drug tests taken which are dated. The Plaintiff had complied even while there was no court order for the Plaintiff to comply with drug testing.

187.   Ashlee Walker also Stated to Erin Awes that the Plaintiff failed a drug test on January 4th, this too was used as reasoning to change the evaluation results and suggest drug dependency. The Plaintiff can and will prove this as false as the result of this test which was taken at Friedel and is dated January 4th, and is time stamped down to the second and the result for this test is negative. Erin Awes chose to omit adding that Plaintiff had tested the day of the evaluation and that those results were also negative. Or that the Plaintiff was testing daily for 6 months and had not had a positive test result since the disputed result at the start of the case.

188.   Erin Awes also added to the report that Plaintiff has a history of mental health issues and issues from her childhood that need addressed. None of this is true and the plaintiff has no such history, and none of this was documented within the initial accurate evaluation. With this the evaluator then changed the Plaintiff's recommendations to "mild risk of drug dependency" adding the recommendation that Plaintiff be required to attend "Intensive Outpatient Treatment." And provided a false record of chemical dependency.

189.   Not only did Ashlee Walker falsify the Plaintiffs medical records, she knew she caused this change, and she chose to not disclose this to the plaintiff. Rimrock also neglected to notify the plaintiff of the change. Ashlee Walker intentionally did not inform the plaintiff in order to use the Plaintiff's failure to sign up for the now recommended treatment, as reasoning that the case not be dismissed at the upcoming status hearing that David Duke petitioned the court for, to ask for the case to be dismissed.

190. Ashlee walker while being fully aware of her malice and fraud directly acknowledged the court and stated that the Plaintiff was not complying and following recommendations. Making it appear to the courts that Ms. Mittelstaed didn't care about her children, or want to do what was needed to get them back.

The judge denied the plaintiffs request for dismissal based on these deceitful and malicious acts, and plaintiff was forced to pay for and to participate in a treatment program that was not needed. That was completely ineffective. And created a fabricated medical history of drug dependency. On April 4th, 2019 during court the judge had informed all parties that he intended on dismissing the case on May 9th so long as the parenting plan was signed. It was because of this knowing that the department and Ashlee Walker made further attempts to create reasoning to keep that from happening. Ashlee Walker in an attempt to again deceive the Plaintiff and the court emailed the Plaintiff stating, she had received "multiple emails and calls," from the "therapists of the children claiming they had concerns that Ms. Mittelstaed would not be continuing therapy after the case closes." The Plaintiff was confused by this claim as she was very involved and communicated frequently with both therapists. And in knowing of the upcoming case closure, had just spoken to one of the therapists on this exact topic. Their conversation did not even remotely imply that as being the plaintiff's intention.

191. Ms. Mittelstaed emailed the therapists about this and they too were confused and bothered by these allegations. They stated they "had not contacted Ashlee Walker at all," and not only did this "not take place," but "they didn't have these concerns." The Plaintiff showed the therapists the email from Ashlee Walker, and they were both disturbed by it and wanted an explanation from Ashlee Walker as to why she made this false claim.

192. Even after being confronted by the therapists about the claim being false Ashlee Walker on May 9th while aware that her claims where deceitful and fraudulent stated them to the court anyway. Then in an even further desperate attempt to keep the case from closing, Ashlee Walker and the state attorney out of desperation claimed that "they did not think the case being dismissed on the completion of the parenting plan was in the best interest of the children anymore, either."

193. They claimed that Jason JP was an "absentee father" and had a "CPS history" and an "extensive criminal record" that the courts should "look into," before deciding to dismiss the case. They then asked the court to "grant them six more months to do so." They made this claim when they in fact knew since the opening of the case JP's history and the risk. Not only did the Plaintiff and the Plaintiff's Family plead with them for months, not to place the children in his home, they have this information documented, stored and accessible within their own records. The same records and reports they responded to and investigated that involved abuse years prior. As well as the police reports and other reports made during this case which they ignored. None of this mattered enough to them to do something when it benefited the Plaintiff's children, but it mattered when it benefited them.

194. The Plaintiff was put in an unfavorable position, where she would have to defend herself in a situation she had never experienced, within a court system that's processes she had minimal knowledge of. And she would be doing so against individuals who had been given the authority, power, and protection of the government, and while being mentally, physically and emotionally broken and without having access to pertinent information. All while knowing that her children where what was at stake. This was absolutely traumatizing to the Plaintiff's and the Plaintiff's children's emotional and mental health. The plaintiff was being tortured

and deceived and had no idea the full extent of the manipulation. Or to the extent for which her rights had or where being violated.

195. The Plaintiff trusted that the laws and the ethical obligations of Debran Anderson, Ashlee Walker, Brittney Anderson, Jason Larson and the others involved would have merit over their actions. and that was where she was wrong. Not only did these things give the state an unfair advantage, the fact that the Plaintiff was prevented from having access to and was never made fully aware of the pertinent details of the case, despite her consistent requests for more information, made it impossible for her to know what she was defending or what allegations were being made against her.

196. On May 9th, 2019 the case was dismissed, and the Plaintiffs children where returned to her care. The Plaintiff didn't receive the Affidavit of Debran Anderson until 2020. Upon reviewing the affidavit, the Plaintiff found that the statements of the alleged facts made by Debran Anderson where either fraudulent, or Misinformation.

197. The Department still has yet to release the Plaintiffs case file, despite multiple requests to the department asking for it to be released they refuse to do so. The only information she has had access to is information obtained recently from David Duke and the child and families ombudsman during her investigation. Due to refusal of the department to disclose this information the plaintiff continues to go without all pertinent documents and facts.

198. Debran Anderson, and Ashlee Walker intentionally acted with malice by omitting the actual facts in an attempt to deceive the courts into adjudicating the Plaintiffs children without there being a reason. Their actions in addition to the actions of each individual whose egregious conduct is mentioned above was willful and malicious and caused multiple deprivations of the rights of the Plaintiff and

those of the plaintiff's children MJP, RSP, and CMS. And subjected them to severe emotional, mental, psychological, physical, and financial detriment.

199.   On Nov, 5th 2018 The department came into the plaintiff's home and forced her to own character and behavior that wasn't hers. They created, and implied to a situation that did not exist. Forcing the closure of her Daycare and preventing her from obtaining any employment while slandering her name, inflicting egregious injury and causing financial hardship during a time when the family was already dealing with devastating circumstances.

200.   While the plaintiff admitted that she did make a very poor choice. And it was wrong. She had enough self-awareness and intellect to correct such a mistake on her own accord, and could have done so more effectively, had she not been unjustifiably accused of child abuse, had her ability to mother her children not been maliciously deprived of her, and her privacy violated. Had she not been subjected to intimidation and harassment, and retaliation.

201.   This was not a situation that warranted the guidance, or force of the government, in order to protect The Plaintiffs children's or anybody's safety. As the mistake she had made did not cause her children, or anyone to be injured; or put them at risk of such. There were no indicators of an emergency situation. The plaintiff had multiple statements from therapists, pediatricians and more. These where people who had consistent interactions with the family, spanning years. Both personal and professional. They could provide accurate and impartial opinions, on how the Plaintiff parented her children and the environment she provided. But this information was disregarded and intentionally not considered at any time during the departments conducting of what Debran Anderson attests to being a "thorough investigation into the claims."

202.  Since June 30th 2011, the day her oldest son was born and 24 hours a day, 7 days a week, 365 days a year thereafter, the Plaintiff had been a mom. And that has been a position that she has dedicated her entire life to be the best she could be at. The Plaintiff did by no means claim to be a perfect parent, and even if assistance had been needed, it in no way warranted any of what occurred. What was the reason? What was gained by allowing such atrocious actions to be subjected upon the Plaintiff and her Children?

203.  What reasoning is there that could justify and explain why the department would make such overtly false statements, omit facts, and act to violate someone's rights to their children, preventing them from defending themselves? What does the Department if having legitimate reasoning as to their actions, lose by telling the truth? What actions of the department would have been threatened by allowing the Plaintiff her constitutionally protected right to due process and her right to defend herself?

204.  She was forced to own character that was not hers, and asked to fix problems that where created, and had no merit to be addressed. She was stripped of her rights and of her relationship with her children by the use of threats, intimidation, suppression of evidence, malice, fraud, assault, and abuse of authority. For 8 months she was subjected to cruelty, and treated with extreme indifference. The plaintiff is unaware of how it feels for a mother who has truly neglected or abused her children, to have their children taken away and kept from them. Or if it does, or doesn't affect them the same. But for the plaintiff as a mother, whose children are her life. Who never abused or neglected her children. Who loved, nurtured and cared for them to the fullest since they entered her womb. To be told  that she can't be trusted to keep them safe, they in fact need to be kept from her for their protection, and she is no

longer worthy of mothering them, was the worst pain she has ever felt. And that type of pain shouldn't be forced upon anyone who isn't deserving of it.

205.  To be subjected to such maliciousness is unfathomable, add to that the reality of finding out that the people for whom the Plaintiff was at the mercy of, who had been given the power, authority and protection of the government. Who were supposed to be advocating for her and her children, where in fact acting against her and she would be forced to endure egregious acts of abuse at their will. And there would be no one to reach out to who would help her. If anyone would be expected to be on the Plaintiff's side it would have been David Duke, however; the state provided for her to be represented by nothing more than a warm body. It was clear Mr. Duke had no intention of fulfilling his duties to the Plaintiff. Not much can be expected when dealing in an environment that sets low expectations. David Duke believed his expectation was to make it look like the Plaintiff was being counseled and her constitutionally protected liberty interests where being defended. When in reality he knew nothing about the case, and took no actions to educate himself on the facts of the case to act in her defense.

206. All involved used their respected privileged authority to manipulate the Plaintiff's life and the circumstances to whatever suited their interests. It's been almost three years and the plaintiff are still not fully aware of all the details of her case, and that is unacceptable. There are documented requests made for her case file. One request was acted upon. This is documented within an email exchange with multiple people attached, this email exchange shows David Duke at the request of Ms. Mittelstaed, asking for disclosure of her case file. While sending the documents within the email, its realized that some documents given are blank. The Plaintiff as well as David Duke clearly request this to be addressed, and the documents are resent, yet they remain blank. Again, it is relayed to the multiple

individuals attached to the email that the issue has not been resolved. They are re-sent this time alleging that those initiating the release had checked them before re-sending and they were no longer blank.

207. However, it's obvious they are still very much blank. This is relayed again only this time there would be no response or correction. Failing to provide the remaining documents and choosing to ignore further requests for correction. This wasn't an email exchange between only two people. This was an email attached to about five individuals, who all were aware of the initial request, where aware of the incomplete disclosure, and where aware of the plaintiff and Mr. Duke's response that the documents remained blank after being resent. And not just "one" individual chose to not act on their duty and within the laws, and fulfil the request. Five of them did.

208. The loss to the Plaintiff and her children MJP, RSP, and CMS is extensive. Her children were traumatized and suffered emotional and physical injuries. They were forced into the re-introduction of their bio dad, whom allowed them to be abused, later abandoning them for three years. After the case was closed and after being forced to do a parenting plan, he left the state and didn't even tell his children or say goodbye. He didn't care enough to even let them know he was leaving. And the Family hasn't seen or heard from him since. Because of this the plaintiff's children again experienced abandonment, that could and should have been prevented.

209. MJP had to move schools after the plaintiff was slandered by his teacher, as a result of Ashlee Walker maliciously disclosing her information. The Plaintiff was deprived of her ability to work and pursue her career preventing her from supporting her family who was already experiencing financial hardship due to Mr. Sheet's medical condition, the plaintiff's credibility and reputation where damaged she had

her confidential and private information disclosed publicly and on social media, was deprived almost entirely of her constitutional rights. Was tortured to the point of attempting to take her own life, harassed, threatened and intimidated, almost daily while having her children held over her head, denied medical care, forced to miss birthdays, and spend Christmas and other holidays alone, accused of being non-compliant, unreachable, that she refused to work with the department when she in fact was jeopardizing her well-being bending at the will of the department. Then these deprivations of her visitation where misrepresented to the court and used against her, claiming that she had missed all her visitation with her children, to make it seem as if she just never cared to show up for visits and couldn't be contacted. When In fact she did everything she could in order to be allowed visitation, And the only times she didn't was because she was not allowed to by the department and its employees, for reasons that were cruel and unfair.

210. Her children were kidnapped and adjudicated as youths in need of care while there was no evidence to support the allegations. The courts Substantiated child abuse against the plaintiff and placed her on an abuse registry forcing her to close her child care business and preventing her from pursuing her career without ever providing any proof and without the Plaintiff being provided notice and without due process of law, depriving her almost entirely of her rights.

211. All of this was done because the plaintiff got on the bad side of the wrong people, with too much privileged authority. The plaintiff wants to believe that this isn't something that is a common occurrence with cps, and that she just got really unlucky with it happening to her. And hopes that this can be used as a base for making improvements to do better. It's essential that accountability is taken and that these actions are acknowledged and not allowed to further be ignored. Nothing can

be corrected if the belief remains that there has been nothing done wrong. What is not repaired will be repeated, and that is her greatest concern.

212.  Filed with this complaint is multiple documents that support and provide proof of the violations alleged herein.  Included is the report findings of an investigation conducted by the Children and Family's Ombudsman pertaining to this case which the department has denied but the Plaintiff can and will prove at trial.

213.  Complaints have also been submitted with the U.S Department of Health and Human Services, and The OCR informing them of the violations of and the ongoing failures to report Violations of 42 CFR part 2,  HIPPA Privacy Act, Unauthorized Disclosures and Re-Disclosures,  of the Plaintiff's confidential, private, health and substance abuse/drug treatment information, and for failures to respond to Ms. Mittelstaed's multiple requests for disclosure to provide copies of any and all personal records pertaining to the plaintiff, her children and the case in question, and requests for correction of documents.

## FIRST CLAIM FOR RELIEF

### For Violations of Federal Civil Rights (42 u.s.c. §1983)

### 1st, 4th, and 14th Amendments Familial Association, Care Custody and Control of one's Children, perjury, malice

## COUNT ONE

### (DEBRAN ANDERSON)

214.  Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, each of the foregoing paragraphs.

215.  Plaintiff alleges that the right to intimate relations, familial association, care custody and control of one's children, to be secure in ones person against unreasonable searches and seizures by government officials, and to due process of law guaranteed under, the 1st, 4th, and 14th Amendment  is "clearly established" such

that a reasonable social services agent in Defendant Debran Anderson's situation would have known it is unlawful to remove a child from the care, custody, and control of its parents absent exigent circumstance. And without due process of law.

216. Where government action substantially interferes with fundamental rights, such as the right to family relationships, it is subject to strict scrutiny, the government must have a compelling reason for its action and its means to achieve its goal must be as narrowly tailored as possible.

217. Although the government certainly had a compelling interest in protecting the plaintiff's children, the state of Montana, however has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that the child has been abused or is in imminent danger of abuse.

218. Providing by statute that "officials may remove a child from the custody of its parents without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily or psychological injury and that the scope of the intrusion is reasonably necessary to avert the specific risk." Montana Statute also has provisions under 40-6-701 that Govern state actions when dealing with fundamental parental rights.

219. None of the information obtained by Ms. Anderson prior to or at any time thereafter the seizure of MJP, RSP, and CMS from their mother was indicative of abuse. in fact, the information obtained was evident of the children being healthy, happy and well cared for, having all their mental, emotional and physical needs met. Debran Anderson confirmed this to be true when on November 5th 2018 after speaking with the Plaintiff and inspecting the plaintiffs home as part of her investigation, she concluded that the children did not appear to be abused or at risk

and stated that it was her intention to close the report as unfounded as soon as the plaintiff submitted to drug testing, leaving the Plaintiff's home allowing MJP, RSP, and CMS to remain safely in their home and under the care of their loving and nurturing mother. Further proving that Debran Anderson did not believe emergency removal was necessary and the children were not at risk if left in their mother's care. Debran Andersons acts of concealing exculpatory evidence, providing perjured statements, harassment, intimidation and refusal to provide plaintiff her case record information forced removal and banning of all communication between them, was not the most narrowly tailored means to achieve the departments goal.

220. Defendant Debran Anderson had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct herself in a manner that confirms, provides for, and does not violate the protections guaranteed the Plaintiff under the United States Constitution, including those under the Fourteenth Amendment, to include without limitation, the right to due process of law, and to the protection of parental rights, family integrity and the right to familial relations.

221. On or about November 7th, 2018 Defendant Debran Anderson was acting under color of state law when she acted to violate Plaintiff's civil rights by, removing, detaining, and continuing to detain MJP, RSP, CMS from the care, custody, and control of their mother, without judicial authorization, parental consent, and without independent, corroborative, and articulable information indicating that a current risk of physical or psychological harm to MJP, RSP, CMS existed.

222. Debran Anderson, on November 7th either failed to investigate and asses the safety of the children or knowingly fabricated physical neglect allegations, in order to/before demanding the Plaintiff release her children to the department. When Plaintiff refused, Ms. Anderson threatened that she either comply or be arrested

potentially, in front of her children when Ms. Anderson comes to her home with an officer to take them into protective custody.

223. Due to the threat of arrest the Plaintiff brought her three children MJP, RSP, and CMS to the department where she was forced to release them to the department and her mother. Debran Anderson took custody of the children by use of threats, intimidation, and coercion under duress, without Ms. Mitteistead's consent yet she declared under perjury in her sworn affidavit to the court that the Plaintiff's children on November 7th where "*voluntarily*" removed from the home upon the Plaintiff "*agreeing*" to a "*voluntary*" *Safety Plan.*" Therefore, committing the act of fraud and perjury and conducting a warrantless seizure of MJP, RSP, and CMS. Violating the due process rights of the Plaintiff who attests to and will prove that she never voluntarily agreed to services with the department or to the allegations, removal and continued detention of her children. Based on these facts the November 7th removal was in fact a warrantless seizure for which judicial authority for an "emergency removal" by Debran Anderson per MCA was not obtained or requested, nor did Debran Anderson at this time fulfill the statutory requirements of MCA. Or those of CFSD Policy 301-1 which provides that: Whenever the Department intervenes with a family and removes a child from the parental home, a legal basis must exist for the removal and for the continued foster care placement. Filing a child abuse and neglect petition initiates the judicial process whereby the Department receives judicial approval of the Department's actions regarding the individual child.

224. The type of relief granted by the court depends on the type of petition filed. "With the exception of the affidavit filed in support of the initial petition in a child abuse or neglect proceeding (which must be submitted to the county attorney within 2 working days to assure the petition is filed within 5 working days of the removal), the Child Protection Specialist must file all affidavits supporting petition in a timely

manner to assure the petition is filed and the hearing scheduled within the timeframes applicable to each individual case." The Child Protection Specialist must provide a copy of the affidavit to the parents, if possible, within 2 working days of the emergency removal. The Child Protection Specialist must file all reports required for permanency hearings or status hearings no less than 5 working days prior to the scheduled hearing. The report must be filed with either the office of the attorney representing the department or with the court depending on the established local protocol.

225. Unless arrangements acceptable to the agency for the care of the child had been made by the plaintiff or a written prevention plan had been entered into pursuant to 41-3-332, which despite the fraudulent claim by Ms. Anderson in her sworn affidavit, that her removal of the Plaintiffs Children on Nov, 7th was supported by evidence and a voluntary plan, neither of these claims are true. Which violated the Plaintiffs right to due process and illegally impinged upon her liberty interests.

226. Debran Anderson would continue to make fraudulent claims and omit facts in attempts to deceive the courts for the entire time she was assigned to the case. Debran Anderson forced the plaintiff into submitting to excessive and unreasonable drug testing requirements absent a court order then used the fraudulent claim of the Plaintiffs failure to meet these requirements, however untrue, as reasoning for the need for services in her affidavit to the courts. Acted with extreme deliberate indifference to the Plaintiffs health and safety by forcing the Plaintiff to submit to drug testing procedures while knowing there was a high probability of injury to the Plaintiff by her submitting to this form of testing and refusing to allow the use of ulterior methods, when there were other safer less harmful options available. And further Making whether or not the Plaintiff would bend at Ms. Andersons will and

comply to all her demands a condition for which she would allow her contact with her children. Later canceling all but one of the Plaintiffs scheduled visits with her children including her daughters 5th birthday and the Christmas and New Year's holidays. Causing the Plaintiff while alone on Christmas and severely depressed. Said acts were taken deliberately, or with callous or reckless indifference to the substantial rights of Plaintiffs or fueled by an evil motive or intent.

227. As a direct and proximate result of Debran Andersons misconduct, Plaintiff has suffered, and will continue to suffer, general and special damages including but not limited to, physical and/or mental anxiety and anguish, among other things.

228. The acts of Debran Anderson where intentional, done with malice, oppression, or fraud, or motivated with the intent to cause injury to Plaintiff, or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, and contemptible manner. Plaintiff is therefore entitled to recover punitive damages from Debran Anderson in her individual capacity, as permitted by law and as according to proof at trial, due to Debran Anderson's wrongful and egregious conduct as herein alleged and to deter her from such conduct in the future.

## COUNT TWO

### For Violations of Federal Civil Rights (42 u.s.c. §1983)

### 14th, Amendment right to Due Process, fabrication of evidence, fraud, perjury, malice, withholding/ omitting of expletory evidence,

*(Debran Anderson) (Ashlee Walker) (Brittney Anderson)*

*229.* Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, each of the foregoing paragraphs.

230. Plaintiff believes and thereon alleges that, at all times relevant herein, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the

government and its employees, such that reasonable social services agents in Defendants' situation would know it is unlawful to lie, fabricate evidence, and/or suppress material exculpatory evidence in court reports or any other document filed with the court to influence judicial decision making.

231. In fact, Defendants' Debran Anderson, Ashlee Walker, Brittney Anderson, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to the Court with power to adjudicate substantial rights, including parental rights, and to refrain from using improper and deceptive means to obtain judicial sustention of recommendations seeking to disparage Plaintiff's liberty interests.

232. In doing the things alleged herein above, Defendants', and each of them, were acting under color of state law when they acted, or knew and agreed and thereby conspired, to knowingly present false allegations, false or coerced testimony, fabricated evidence, and/or suppress exculpatory evidence, before the Court, thereby violating Plaintiffs' rights found under the 14th amendment of the United States Constitution and breaching their respective duties to Plaintiff in a grossly Negligent Manner.

233. As a direct and proximate result of these Defendants' violations while breaching their respective duties and in accordance with 42 U.S.C. § 1983, Plaintiffs' civil rights have been violated in that she has suffered, and will continue to suffer, general and special damages.

234. The wrongful and egregious conduct of Defendants', Debran Anderson, Ashlee Walker, Brittney Anderson and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiff, or motivated by an evil intent, such that

Plaintiff is entitled to recover punitive damages in accordance with law and subject to proof at trial.

235. Debran Anderson, Ashlee walker and Brittney Anderson and each of them as mentioned in the factual allegations above had knowledge of facts and intentionally disregarded those facts which created a high probability of causing the Plaintiff injuries, deliberately proceeded to act with indifference to the high probability of injury to the plaintiff in making multiple fraudulent claims with knowledge of their falsity, intentionally misrepresented or omitted known facts to the courts in order to deceive the courts into granting a warrantless emergency removal and allowing the continued out of home placement of Plaintiffs children acted to conceal material facts for the purpose of depriving the plaintiff of her children and legal rights.

## SECOND CLAIM FOR RELEIF
## STATE LAW CLAIMS
## "ACTIONS UNDER MONTANA TORT CLAIMS ACT"

In accordance with the provisions of the Montana Tort Claims Act and MONT. CODE ANN. § 2-9-301. On September 10th, 2021 the Plaintiff provided notice to the State of Montana Risk Management and Tort Defense Division by mailing via certified mail Documents titled "Notice of Fourth coming Lawsuit" Detailing all allegations within this formal complaint including copies of documents providing proof in support of this claim. The Department's failure to grant or deny the claim within 120 days is considered a final denial setting forth the commencement of this claim.

## COUNT THREE
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *(Debran Anderson) (Ashlee Walker) (Brittney Anderson)*

236.    Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, each of the foregoing paragraphs.

237.   Plaintiff believes and Alleges that County social workers, Debran Anderson, Ashlee Walker, Brittney Anderson engaged in the above-mentioned extreme, egregious unlawful conduct, including but not limited to, Debran Anderson acted with malice when she intentionally subjected Ms. Mittelstaed to endure unreasonable conditions and demands that where known to be unobtainable, oppressive and excessively cruel, and created a high probability of causing harm to the Plaintiff, for the purpose to punish her for not being submissive to Debran and because she didn't like her and felt she thought too highly of herself and needed put in her place.

238.   The Plaintiff alleges that Debran Anderson would make Elisa's compliance with these demands a condition that would allow her to have visitation with her children, however, often times Debran would cancel or not allow her visits regardless of whether or not Ms. Mittelstaed fulfilled or met these demands, canceling all but one of her scheduled visits from November 7th 2018 through February 2019. Not allowing the Plaintiff to attend her daughter's 5th birthday party when she was experiencing a severe allergic reaction to the drug patch that Debran Anderson without a warrant or voluntary agreement from the Plaintiff forced her by way of fraudulent threats to have put on. And despite the severe symptoms and Debran being fully aware of the Plaintiffs worsening condition and need of medical care threatening the Plaintiff that if she sought medical care and the patch was removed, (which Debran was Aware that due to the severity of the injury that the patch needing to be removed was likely necessary) she would not allow her to see nor celebrate with her daughter RSP and her other children for RSP's birthday party.

239. Debran Anderson knew that due to the Plaintiffs love for her children she would do anything to keep them from feeling like their mother didn't care about them or remember her not being there for a birthday which she had never done. Ms. Mittelstaed did not get medical attention and instead she prepared and despite her condition excitedly planned her Daughters Birthday celebration from a distance while suffering through excruciating pain that eventually caused her to vomit and develop a high fever forcing her to seek medical care a choice that would result in Debran Anderson forbidding her of attending the party or having any visitation.

240. Debran Anderson would continue this cruel and outrageous conduct when she would not approve the Plaintiff visitation to spend Christmas or new years with her children and family. She had no justifiable reason not to allow the Plaintiff to spend the Christmas Holiday with her family. Debran Anderson did so for the soul purpose of inflicting emotional suffering onto the plaintiff for her own enjoyment. The Plaintiff was left to spend Christmas through new year's alone and extremely depressed these acts directly contributed to the Plaintiff later attempting suicide.

241. As a result, Debran's grossly negligent conduct acting with deliberate indifference to the foreseeable severe emotional harm that the canceling of her visits and not allowing her to see her children would cause and the injury that would follow and disregarding and acting indifferent to the risk of injury to the Plaintiff. Debran Anderson's evil intent and maliciousness towards the plaintiff would only continue to exceed the bounds of common decency and while knowing the facts of what she had subjected the plaintiff to she would under penalty of perjury misrepresent the reasoning of the lack of visitation within her affidavit to the courts making it seem as if it where the plaintiff choosing not to see her children she did this in order to make the Plaintiff look bad and falsely portray her as an uncaring mother to the courts in order to keep her under her thumb.

242. Ashlee Walker intentionally inflicted extreme emotional distress onto the plaintiff by Removing RSP from the care of her grandmother (Diane White) and placing her in the care of her Biological Father (JP) And doing so while having knowledge that JP registered as a violent offender had a criminal record consisting of multiple PFMA charges, for abuse of the Plaintiff and the mother of two children whom his rights where terminated, multiple felonies including a felony charge in 2008 for aggravated assault with extreme indifference to the human life, for almost killing a women in Wyoming, was on interstate compact out of Wyoming serving a 10 year probation sentence for this charge at the time of RSP's placement in his home. and an extensive CPS history that included the neglect of RSP and MJP which was investigated by the department. These acts where done by himself and his live-in girlfriend DR who also has an extensive CPS History that includes the termination of her parental rights to two of her children and who also had a felony record for which she was serving probation for at the time of RSP's Placement in their home. It appears due to her knowledge of the very significant risks and the number of documents to substantiate the risk and her placement of RSP there anyway, that this outrageous behavior was for the sole personal interest of Ashlee and [AK] to inflict emotional turmoil onto the Plaintiff, causing severe debilitating worry that caused the plaintiff to experience health problems and suicidal ideation that eventually lead to a suicide attempt.

243. And for extreme emotional suffering directly caused by Ashlee Walker Willfully and maliciously Disclosing protected private, personal, confidential information including federally protected drug treatment information consistently throughout the life of the case to [AK] who Ashlee Walker was aware had a malicious motive towards the Plaintiff and was also a relative of Ashlee Walker. Using her privileged authority and position to conspire with [AK] to publicly shame,

harass and threaten the Plaintiff, causing her to lose her job and preventing her from obtaining new employment placing the Plaintiff in financial destitution.

244. .Brittney Anderson while having a duty to act, intentionally choosing to act with extreme indifference to the severe and ongoing injury and high probability of continued injury to Plaintiff after being informed of and while having proof of ongoing breaches of the Plaintiff's confidentiality and a substantial reason to believe that the Plaintiff was being threatened, harassed publicly shamed and intimidated allowing the Plaintiff to suffer extreme and outrageous ongoing emotional detriment. These acts exceeded the bounds of common decency usually tolerated by a civilized society.

245. Plaintiff believes that defendants, Debran Anderson and Ashlee Walker and each of them, intended to cause harm to Plaintiff, or acted with reckless disregard for the possibility that Plaintiff would suffer extreme emotional distress as a result of the outrageous conduct listed above.

246. Based on the nature of their work, which can include the use of governmental force to turn children into wards of the state, each of the Defendants owed a special duty of care to the Plaintiff, and knowing of said duty, abused this special relationship and/or position which gave them power to damage the Plaintiff's interest, in egregious fashion; they knew of Plaintiff's susceptibility to injuries through mental distress in order to inflict trauma; and they acted intentionally or unreasonably with the recognition that the acts were likely to result in illness through mental distress.

247. Said actions were performed with deliberate and callous indifference to the liberty interests of the Plaintiff, such that said actions of Debran Anderson, and Ashlee Walker shock the conscience.

248. As the direct and proximate result of the extreme and outrageous conduct of defendants, Debran Anderson, Ashlee Walker, Brittney Anderson the Plaintiff has suffered extreme emotional and physical distress, including but not limited to mental anguish and suffering, sorrow, grief, fright, shame, embarrassment, humiliation, anger, sleeplessness, disappointment, nervousness, anxiety, worry, mortification, shock, and indignity to an extent and in an amount subject to proof at trial.

249. Nobody, including the Plaintiff, could reasonably be expected to endure the types of affront inflicted upon the Plaintiff without sustaining the type of damages herein alleged.

250. Plaintiff believes and thereon alleges that defendants Debran Anderson, Ashlee Walker and Brittney Anderson acted knowingly and willfully, with malice and oppression, and with the intent to harm the Plaintiff. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing Debran Anderson, Ashlee Walker, and. Brittney Anderson and to deter them and others from such conduct in the future.

251. The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.

## COUNT FOUR

### FAILURE TO REPORT/GROSS NEGLIGENCE/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*(Ashlee Walker) (Brittney Anderson) (Yellowstone County)*

252. Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 173; through 190 above.

253.  By virtue of the relationship between MJP, RSP, and CMS and the County, including as between MJP, RSP, and CMS and the individual County social workers Debran Anderson, Ashlee Walker and Brittney Anderson, a fiduciary duty existed relating to the provision of reasonable care and a safe environment to MJP, RSP, and CMS. Further, because the County assumed wardship of MJP, RSP, and CMS, it owed their mother, as part of Elisa Mittelstaed's liberty interest, reasonable safety and adequate care of MJP, RSP, and CMS therefore a preexisting relationship between the County and the Plaintiff therefore existed at all relevant times mentioned herein.

254.  The County and its employees breached their respective duties of care by, but not limited to, continuing to detain MJP, RSP, and CMS for an unreasonable period after any alleged basis for detention had been negated; forcibly removing RSP from the care of her Grandmother Separating her from her brothers and placing RSP in a situation where it was reasonably foreseeable that her safety and wellbeing could not be maintained or ensured.

255.  Failing to report or conduct a reasonable investigation or promptly provide aid, comfort, or professional treatment when it was reported by multiple individuals on multiple occasions including the Police Dept. that RSP and MJP sustained injuries during contact with Bio Dad that required medical care while the children where under the custody and care of the County.

256.  Making an unauthorized disclosure to the teacher of MJP without justification and a "need to know," while being aware that this teacher was accused of verbally abusing MJP and knowing this would be against his best interest.

257.  Presenting perjured testimony and fabricating evidence to support the County and the County Case Workers false and malicious allegations that MJP, RSP, and

CMS where being abused and/or neglected by their mother and failing to disclose exculpatory evidence.

258. As the direct and proximate result of the negligent conduct of Ashlee Walker, and The county, The Plaintiff's Children were placed in an unsafe environment that caused severe emotional distress, PTSD, separation anxiety, physical injuries such as but not limited too; MJP/ broken arm, RSP/broken foot; RSP/ pinched and bitten all over her body all of these injuries required medical care at the time of injury and ongoing medical care is needed for further ongoing treatment as a result of this harm. Ms. Mittelstaed and her children have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial.

259. Nobody, including Plaintiff and MJP, RSP, and CMS could reasonably be expected to endure the types of affront inflicted upon the Plaintiff and her minor children without sustaining the type of damages herein alleged.

260. Plaintiff believes and thereon alleges that Ashlee Walker, acted knowingly and willfully, with malice and oppression, and with the intent to harm the Plaintiff and MJP, RSP, and CMS. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

261. The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.

## NEGLIGENCE, GROSS NEGLIGENCE
## COUNT FIVE

*(Debran Anderson)*

262. Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs, above.

263. Pursuant to MCA 41-3-101, Debran Anderson had a statutory duty and was obligated to perform certain required assessments of certain statutory factors before making placements decisions for MJP, RSP, and CMS.

264. Debran Anderson breached that duty by failing to even consider as she is required to do - with the provision of reasonable services, whether MJP, RSP, and CMS could remain safely with their mother. Debran Anderson further breached her duty of care by, failing to perform any assessment at all, much less the mandatory assessment of the statutory factors, prior to the removal of MJP, RSP and CMS from their mother's custody.

265. As a result of the negligence of debran Anderson in breaching her statutory duty the Plaintiffs familial right to the care of her children was violated causing severe emotional distress. The plaintiff has suffered and will continue to suffer general and special damages in an amount and to an extent subject to be proof at trial.

266. The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.

## COUNT SIX

(Debran Anderson)

267. Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs, and above.

268. Debran Anderson had a duty to adhere to CFSD Policy 202-3 which states that absent a court order Debran Anderson may not require plaintiff to submit to

urinalysis; or coerce the Plaintiff into submitting to urinalysis by making the completion of urinalysis a condition for not removing the child from the parental home.

269. Debran Anderson had a duty to act with reasonable care as not to cause injury to the Plaintiff, and refrain from acting with indifference to a probability of injury to the plaintiff.

270. Debran Anderson Breached her respective duty when she forced, by use of threats and coercion and intimidation, and absent a court order the Plaintiff to unreasonable drug testing requirements in order to have visitation with her children. Canceling all but one of her visits between November 2018 and February 2019, then using the lack of visitation as a basis for continued removal.

271. Forced the Plaintiff to undergo a dragger drug test absent a court order while having open healing wounds in her mouth for which undergoing such testing put her at risk of potentially serious complications.

272. Forced the Plaintiff to wear a sweat patch absent a court order and when the Plaintiff informed Debran she was experiencing a serious reaction to this patch that required medical attention, Debran Anderson despite knowing of the need for medical care and the high probability of risk to the Plaintiff by not receiving care, threatened to not allow the Plaintiff contact with her children if needed medical attention was received.

273. When Plaintiffs condition worsened to the point of having no choice but to seek medical care Debran Anderson followed through with her threat and would not allow the plaintiff contact with her children and forced her to miss her daughter's birthday party as well as Christmas and new years that followed.

274. Debran Anderson absent a court order forced the plaintiff to undergo an unreasonable demand of scheduling and completing a chemical dependency

evaluation within the four short days before Christmas in order to spend the holiday with her children and when Plaintiff completed this demand did not allow her visitation regardless.

275. As a direct proximate result of Debran Anderson Breaching her respective duties the plaintiff Was forced to endure days of pain and being severely ill vomiting, with a high fever and infection from the sweat patch until her condition worsened so much that she had no choice but to seek medical care which Debran Anderson for doing so would not allow contact between the Plaintiff and her children. And continued withholding and depriving her of contact and visitation with her children on Christmas and into the New Year which caused so much emotional distress to the plaintiff that she attempted suicide soon after.

276. As a result of this grossly negligent conduct Plaintiff has suffered and will continue to suffer general and special damages to an extent and in an amount subject to proof at trial.

277. Plaintiff is informed and believes and thereon alleges that Debran Anderson acted with deliberate indifference to the high probability of injury to the plaintiff, knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiff. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing Debran Anderson and to deter her and others from such conduct in the future.

278. The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.

## **COUNT SEVEN**

## **GROSS NEGLIGENCE /RIGHT TO PRIVACY/ VIOLATIONS UNDER UNIFORM GOVERNMENT HEALTH INFORMATION ACT**

### *(ASHLEE WALKER) (YELLOWSTONE COUNTY)*

279.  Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs, above.

280.  Plaintiff is informed and believes and herein alleges that both state and federal law in addition to HIPPA Privacy Rule and CFSD Policies provide provisions and statutes that govern the handling of confidential/private health information and procedures for disclosure of said information that all County Social Services Agents are obligated to adhere to, those provisions and statutes are but are not limited to: MCA Title 50 Chapter 16 Part 6; The collection of confidential personal information on clients is essential to the provision of social services. Therefore, the collection of confidential personal information creates a responsibility as well as an obligation of every staff person to collect, utilize, store and preserve the information in a manner which preserves the integrity and privacy of the applicant or recipient of social services.

281.  Safeguarding confidential information is essential to preserving the integrity and privacy of clients. This includes alcohol and drug abuse patient information. DPHHS and CFSD staff must maintain the confidentiality of case record information gathered by providing direct services. Each employee is responsible for his or her own actions and for knowing and understanding the agency's policies and laws concerning confidentiality. All Department employees shall comply with Department policies regarding confidentiality. Any use or disclosure in violation of policies is subject to disciplinary action up to and including termination of employment.

282. All violations of confidentiality, both unintentional and intentional, are presumed to be harmful to the individual whose confidentiality has been violated, and the Department shall consider all violations serious in nature.

283. Under the Confidentiality of Alcohol and Drug Abuse Patient Records (42 CFR Part 2, Subpart A), of the Public Health Service Act, any person who violates any provision or any regulation issued pursuant to this provision shall be fined not more than $500 in the case of a first offense, and not more than $5,000 in the case of each subsequent offense.

284. Ashlee Walker, The Department and its employees have an obligation to release the minimum necessary to those with a "need to know" confidential and protected health care information pursuant to Mont. Code Ann. § 41-3-205, Mont. Code Ann. § 42-3-101, Mont. Code Ann. § 42-6- 101 et seq., Mont. Code Ann. § 50-16-601 et seq., 20 USC § 1232(g), 42 CFR Part 2.

285. Both Elisa Mittelstaed and her children have rights to privacy under the State and Federal Constitutions. These constitutional rights to privacy are significant and any disclosure should be made so as not to violate these rights that exist to prevent harm to the Plaintiff and her children from allowing their private information to be released when not authorized or otherwise permitted. In accordance with Mont. Code Ann. § 50-16-604, disclosure of health care information regarding a child's parents or other nonparty to the case is presumed to be harmful to that person.

286. Disclosures of "Protected Health Information" (PHI) under the Health Insurance Portability and Accountability Act (HIPAA) must be accounted for by every single-covered entity under HIPAA. CFSD coordinates with the DPHHS Privacy Officer regarding disclosures and breaches and the Privacy Officer documents disclosures and breaches in the HIPAA Database court orders, to ensure compliance with Federal and State Regulations.

287. The only circumstances under which Elisa Mittelstaed's health care information may be disclosed to any entity other than Ms. Mittelstaed or her attorney, without harm, are:  if the Plaintiff has signed an authorization specifying which health care information may be disclosed and specifying to whom the health care information may be disclosed.

288.  Plaintiff is informed and believes and herein alleges that Ashlee Walker has a statutory duty to safe guard the confidential case record information pertaining to the Plaintiff Per State and Federal regulations as mentioned in detail above; not limited to MCA 50-16-553, 50-16-502; The Uniform Health Care Information Act; MCA 41-3-205 and 42 CFR Part 2.

289.  Plaintiff Elisa Mittelstaed has a reasonable expectation of privacy in the contents of her medical records, medical history, such that she, or any other reasonable person, would not expect a social worker, without any right or consent, to, disclose without authorization and with intent to cause harm, or to request and change the information contained in such records with the intent to cause harm.

290.  Ashlee Walker, intruded upon the privacy of Plaintiff', further breaching her respective duties by, but not limited to, requesting the disclosure of medical records for which she was not authorized to receive, signing a confidentially agreement forbidding her of any re-disclosure of said confidential information.

291.  Violating this agreement and the laws providing protection of dissemination of such information by making multiple further malicious re-disclosures of said information, falsifying medical records, by communicating as facts, information Ashlee Walker knew not to be true or factual, with the purpose and intent of altering the Plaintiffs medical records to induce an inaccurate finding of drug dependency.

292.  Which such finding would and did so in fact result in an inaccurate diagnoses of drug dependency and need for the Plaintiff to receive unnecessary and ineffective

intensive outpatient treatment. Ashlee Walker induced this change and had full knowledge of her responsibility to inform the plaintiff of said change yet intentionally concealed the information, causing the Plaintiff because she was unaware, not to follow up on the new recommendations which now required her to receive Intensive outpatient treatment.

293. Ashlee Walker being aware of the Plaintiff petitioning the courts for a hearing to request case closure committed these egregious and malicious acts for the sole purpose of using them against the Plaintiff at the upcoming hearing, to give the impression of carelessness and noncompliance. Which would impact the courts discretion and Resulted in the courts denying the Plaintiffs request that the case be closed further prolonging the states involvement.

294. The Plaintiff is informed and believes and therefore alleges that Ashlee Walker further breached her respective statutory duties by conspiring against the Plaintiff with [AK] whom is not only an individual with known evil motives towards the Plaintiff but is related to Ashlee Walker who willfully and with malicious intent disclosed the Plaintiffs confidential information to [AK] knowing that [AK] intended to use said information to harm and inflict suffering onto the Plaintiff by but not limited to posting the Plaintiffs private and confidential information publicly to social media on multiple occasions, ruining the plaintiffs reputation and causing her name to be slandered, the forced closure of her business, forced resignation and loss of two year contractual bonus due to making multiple calls/complaints to the Plaintiffs employer/potential employers divulging to any open ear her confidential and private information as well as fabricated claims. Ultimately Preventing the Plaintiff from obtaining new employment and pursuing her career.

295. Ashlee Walker knew or should have known that disclosing the Plaintiffs private information to [AK] whose evil intent was known to create a high

probability of injury to the Plaintiff, Ashlee Walker with deliberate indifference to the high probability of injury disclosed the information anyway resulting in injury to the Plaintiff.

296. Ashlee walker Continued to breach that duty in making multiple further disclosures to [AK] repeatedly over an 8-month period and failing to cease such acts after the departments involvement with the Plaintiff had ended.

297. Ashlee Walker disclosed without authorization, reason, or justification the plaintiff's private confidential information to MJP's teacher after the plaintiff expressed the issues and conflict between them and her asking that no information be shared with this teacher as she was concerned it would only make matters worse for herself and MJP who still had to go to school and see her every day. She did so while continuing to be fully aware of and with a complete disregard for the injuries these actions where causing.

298. Said intrusions upon the family home and privacy interests of Plaintiffs and the malicious, ongoing disclosures of confidential information and failures to correct said breaches would be highly offensive and detrimental to any reasonable person, and was, in fact, highly offensive, and caused extreme detriment to Plaintiffs.

299. As the direct and proximate result of defendant Ashlee Walkers dereliction of duty and invasion of privacy while acting in her official capacity, Plaintiff has suffered, and will continue to suffer, physical, mental, and emotional injury, as well as financial loss of past present and future earning capacity, inability to pursue her career. general and special damages all to an extent and in an amount subject to proof at trial.

300. Plaintiff is informed and believes and thereon alleges that Ashlee Walker acted with deliberate indifference to the high probability of injury to the plaintiff,

knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiff. Therefore, Plaintiff is entitled to an award of civil remedies under MCA 50-16-553 and punitive damages for the purpose of punishing Ashlee Walker and to deter her and others from such conduct in the future.

301. The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.

## COUNT EIGHT

*_( Brittney Anderson) (Jason Larson) (Yellowstone County)*

302. Plaintiff realleges, and incorporates herein as if set forth in full, all paragraphs above.

303. The plaintiff is informed and believes and herein alleges that MCA 50-16-606 Establishes Title 50 Chapter 16 part 5 of the Uniform Health Care Information Act as governing statute for which CFSD is subject too. In addition to but not limited to Provisions of CFSD confidentiality and disclosure polices and requirements of CFR 42 Part 2.

304. The Plaintiff believes and therefore alleges that MCA Title 50 Chapter 16 part 5 sets out provisions that the County CFSD, and County DPHHS, Brittney Anderson and Jason Larson and each of them are required by law to adhere to in regards to personal health care information. MCA 50-16-551; 50-16-552; and 50-16-553 enact laws that provide and allow for civil, and criminal remedies for violations of The Government Health Information Act. CFSD Policy also sets out the respective duties of Department Supervisors and Administrators in Safe guarding Confidential Health information and History.

305. The supervisor or designee is responsible for ensuring that members of child protective teams are informed of the Department's confidentiality as well as record disclosure laws. Licensure staff are responsible for assuring that facilities and providers are informed of confidentiality at the time of licensure.

306. Each DPHHS/CFSD Employee must immediately report any disclosure of confidential information by self or by others in violation of federal and/or state law and rule requirements to the applicable supervisor and Regional Administrator, every complaint report regarding an alleged violation of the Department's confidentiality policies shall be promptly investigated by the immediate supervisor. If a violation has occurred, appropriate disciplinary action shall be taken. Violations by Department employees will result in disciplinary or corrective action, suspension or discharge of the employee in addition to any criminal and/or civil penalties that may be imposed by statute.

307. All violations of confidentiality, both unintentional and intentional, are presumed to be harmful to the individual whose confidentiality has been violated, and the Department shall consider all violations serious in nature. When a violation or alleged violation of confidentiality occurs, the immediate supervisor shall notify the Regional Administrator of the breach or alleged breach. The Regional Administrator and immediate supervisor, if appropriate, shall investigate regarding the breach or alleged breach. The Regional Administrator shall also inform the Field Services Administrator and the Division Administrator of the breach or alleged breach. The Regional Administrator shall consult with Human Resources in determining the appropriate disciplinary action based on the facts of the violation, if a violation is determined to have taken place.

308. Under the Confidentiality of Alcohol and Drug Abuse Patient Records (42 CFR Part 2, Subpart A), of the Public Health Service Act, any person who violates

any provision of this section or any regulation issued pursuant to this section shall be fined not more than $500 in the case of a first offense, and not more than $5,000 in the case of each subsequent offense. Mont. Code Ann. § 41-3-205 42 CFR Part2.

309. Child protection specialists are responsible for preparing and maintaining case records, dictation, case plans, documentation and other contents of the case record. Child protection specialist supervisors are responsible for evaluating each case and the service provided to the client. Cases must be reviewed by supervisors at the time of transfer or closure and an entry shall be made into the case record to document the review.

310. The child protection specialist supervisor's evaluation of a case shall include ongoing reviews throughout the life of the case to determine whether all electronic and paper case file information is completed appropriately and in a timely manner. Documentation of these reviews should be completed on the various Safety Assessment forms via the supervisor's dated signatures. Dated initials throughout the case record signify that the supervisor is verifying tasks have been completed and are evidence of completed tasks in the case record. Disagreement or dissatisfaction with child protection specialist activity on a case should be dealt with as a training and/or disciplinary matter.

311. Disclosures of "Protected Health Information" (PHI) under the Health Insurance Portability and Accountability Act (HIPAA) must be accounted for by every single-covered entity under HIPAA. DPHHS declared itself a single-covered entity.

312. Each employee is responsible for his or her own actions and for knowing and understanding the agency's policies and laws concerning HIPAA. All Department employees shall comply with Department policies concerning the uses and disclosures of PHI.

313. Every complaint regarding an alleged violation of HIPAA policies shall be promptly investigated by the immediate supervisor, and others involved in the assessment risk of harm to the individual(s). All HIPAA privacy complaints must be reported to the DPHHS Privacy Officer.

314. The Plaintiff is informed and believes and herein alleges that the County DPHHS and CFSD and its employee supervisors Brittney Anderson and Jason Larson and each of them had a duty to follow department policies and procedures and State and Federal Laws regarding the implementing of, responding to, acting upon, and reporting of; complaints, unauthorized disclosures, and conflicts of interest.

315. The Plaintiff is informed and believes and therefore alleges that The County of Billings, its DPHHS entity and its designated supervisors Brittney Anderson and Jason Larson where contacted on multiple occasions regarding the unauthorized disclosures, privacy violations and threats and harassment taking place within CFSD by Ashlee Walker. The County of Billings despite being notified on multiple occasions of the ongoing violations of policy and statutes taking place, and their statutory obligation to report these incidents. In addition to their responsibility to take corrective action and provide needed training failed to do so acting with deliberate indifference to the high probability of privacy and confidentiality violations that would likely arise without their acts to train and supervise their employees grossly neglecting their respective statutory obligations.

316. The County DPHHS, CFSD, and its employee supervisors .[Brittney Anderson], and  Jason Larson and each of them have a respective duty while acting as single covered entities under HIPPA, and while acting in their official capacities as Supervisor and Reginal Administrator of Yellowstone County CFSD  to their subordinates Ashlee Walker, and Debran Anderson, to ensure policies and

procedures are followed and to respond to and take appropriate action upon the receiving of complaints of violations, disclosures or conflicts and to do so according to policy and statute.

317. The County of Billings, Brittney Anderson and Jason Larson and each of them, failed to act on their respective duties upon being informed of a conflict of interest, willful unauthorized disclosures, and serious threats, retaliatory behavior, harassment and intimidation. Brittney Anderson further neglected her respective duty when she not only refused to act upon further reports of ongoing conduct, but attempted to cover up the acts of Ashlee Walker and [AK], denying the plaintiff's requests for a new case worker and not following policy and reporting the disclosure, or taking any required action to intervene to stop the ongoing harassment, threats and intimidation.

318. As a result of Brittney Anderson and Jason Larson's inactions the egregious conduct continued, and plaintiff was forced to endure this treatment while many people were aware and had knowledge of the harm being caused and where indifferent to that harm. Brittany Anderson was informed of the violations, looked into the violations, and later confirmed them to be true. She was informed on multiple occasions of the extent and severity, of the conduct between Ashlee Walker and [AK], the harm being caused, and the risks associated, with ongoing threats of further harm.

319. The Plaintiff expressed to her how she was suffering emotionally, mentally, physically and financially, pleading with her to intervene, only to be met with worsening threats of losing her children in retaliation of her asking for help. false allegations would be created to manipulate the courts and cause the case to be prolonged.

320.   As a direct and proximate result of The County of Billings, Brittney Anderson and Jason Larson who knew or should have known of their duties to act, and had they done so, would have prevented further harm. Acting with deliberate indifference to the Plaintiff's interest and supporting the malicious personal interest of Ashlee walker, Debran Anderson and [AK], the Plaintiff has and will continue to suffer general and special damages in an amount to be proven at trial resulting from their negligent actions, inactions, and for the want for suffering of the plaintiff.

321.   Plaintiff is informed and believes and thereon alleges that Brittney Anderson, and Jason Larson acted with deliberate indifference to the high probability of injury to the plaintiff, knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiff. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing Brittney Anderson and Jason Larson and to deter them and others from such conduct in the future.

322.   The State of Montana and Yellowstone County are vicariously responsible for the conduct of its public employees, under Montana Code 2-9-102 and other applicable statutory and case law.


## COUNT NINE

### (Rimrock Foundation) (Erin Awes)

323.   Plaintiff realleges, and incorporates herein as if set forth in full, all the foregoing paragraphs.

324.   Rimrock Foundation is an "licensed Addiction treatment facility" per MCA 53-24-208 operating under the direction and control of the local government and approved under 53-24-208.   And is governed by both state and federal statues including but not limited to 42 CFR Part 2; MCA 50-16-553; 50-5-106; 45-7-401 50-16-551.

325. The Plaintiff is informed and believes and so herein alleges that Rimrock Foundation is required to designate qualified licensed addiction counselors to preform chemical dependency evaluations and diagnose a patient as chemically dependent. And is further required to have written policies and procedures including supporting evidence of implementation of each of the following items:

clients are treated in a manner sensitive to individual needs and which promote dignity and self-respect. All clinical and personal information is treated in accordance with state and federal confidentiality regulations. Clients have the opportunity to review their own treatment records in the presence of the administrator or designee; clients are fully informed of fees charged, including fees for copying records to verify treatment and methods of payment available; clients are protected from abuse, harassment, and exploitation by staff or from other clients who are on agency premises; clients will receive a copy of client grievance procedures describing the submission and disposition of complaints by client and right to appeal without threat of reprisal; client consent must be obtained for each release of information to any other person or entity.

326. This consent for release of information must include: name of the consenting client; name or designation of the provider authorized to make the disclosure; name of the person or organization to whom the information is to be released; nature and limits of the information to be released; purpose of the disclosure, as specific as possible; specification of the date or event on which the consent expires; statement that the consent can be revoked at any time, except to the extent that action has been taken in reliance on it; signature of the client or parent, guardian, or authorized representative, when required, and the date; and a statement prohibiting further disclosure unless expressly permitted by the written consent of the person to

whom it pertains. And be advised how to access records to which the person is entitled.

327. The Plaintiff is informed and believes and so Alleges that Erin Awes was acting on her duties as employee of Rimrock Foundation evaluating and diagnosing the Plaintiff for chemical dependency these acts require the individual performing them to hold a license in addiction counseling. While carrying out these duties and in providing such services, Rimrock Foundation as a holder of PHI and Erin Awes as a handler of PHI are obligated to adhere to the respective policies enacted by Rimrock, in addition to state and federal regulations and the provisions of the Uniform Health Care Information Act and HIPPA as they pertain to the safeguarding, amending, and disclosing of the Plaintiffs confidential health care information.

328. The plaintiff is informed and believes and therefore alleges that Erin Awes on December 24th 2018 completed the evaluation in question and informed the plaintiff of the results which were that she was not drug dependent and that treatment for dependency was not recommended.

329. The Plaintiff is informed and believes and so herein alleges that on February 28th 2019 Rimrock Foundation Breached the Plaintiffs confidentiality by releasing her chemical dependency evaluation to Ashlee Walker who was not authorized to receive said information. Ashlee Walker was informed when receiving this information that re-disclosure was prohibited however she maliciously re-disclosed this information despite being fully aware that her acts where unlawful.

330. Erin Awes breached her respective duties when she on February 28th 2019 66 days (over 2 months) after completing the Plaintiffs evaluation spoke with Ashlee Walker whom provided Ms. Awes with fabricated and false information in order to deceive Erin Awes into altering the Plaintiffs evaluation which ultimately caused

her medical records and medical history to be falsified in order to induce an inaccurate diagnosis of drug dependency that now required intensive outpatient treatment. Erin Awes did not contact the plaintiff in order to verify that this information that was drastically different from the information obtained from the Plaintiff herself was in fact accurate, nor to discuss the changes made or inform the plaintiff of her new diagnosis of being drug dependent or her new fabricated history of child hood trauma both of which now required treatment to address. Neither Erin Awes or Ashlee Walker informed the Plaintiff.

331.  Ms. Mittelstaed explained to Erin Awes that this information she was given was not in fact true and she could prove that and asked Erin Awes to correct the false information Erin Awes stated to the Plaintiff "I'm not going to argue with you" and hung up. The Plaintiff attempted to contact her further but all calls and messages where ignored, this is true for requests to Erin Awes Supervisor and future requests to medical records that to this day have not been addressed and the information remains to be uncorrected.

332.  As a direct and proximate result of Rimrock Foundation and Erin Awes in Breaching their respective duties the Plaintiffs confidential health information was falsified and disclosed allowing it to be used maliciously to harass, threaten, and intimidate the Plaintiff.  And the Plaintiff was forced to participate in treatment that was unnecessary. Erin Awes and Rimrock Foundation where informed that the information was incorrect and had multiple opportunities to correct the issues and chose not to address them despite being aware that their inaction would very likely result in injury to the Plaintiff.  Because of Erin Awes and Rimrock foundations breaching of their duties the Plaintiff has suffered and will continue to suffer general and special damages in an amount not yet known but to be determined according to proof at trial.

333.  Rimrock Foundation is vicariously responsible for the acts and or inactions of its employee Erin Awes while acting in the scope of her duties.

## JURY DEMAND

Plaintiffs, Elisa Mittelstaed demands a jury trial as to all issues so triable.

## PRAYER

**WHERFORE,** Plaintiffs, Elisa Mittelstaed and MJP, RSP and CMS, prays for judgment against Defendants, as to all causes of action, as follows;

334.  General damages and special damages according to proof, but in no event less than $300,000.00;

335.  As against only the individual defendants and not any municipality, punitive damages as allowed by law;

336.  Costs of suit incurred herein; and

337.  Such further relief as the court deems just and proper.

Dated this 10th  day of November 2022.          /S/ Elisa Mittelstaed
                                                 Pro Se Plaintiff Elisa Mittelstaed